**TRANSATLANTIC FINANCING CORPORATION, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 19632.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 13, 1966.

Decided May 27, 1966.

Mr. Morton Liftin, Washington, D. 'C., for appellant.

Mr. Robert C. McDiarmid, Atty., Dept. of Justice, with whom Asst. Atty. Gen. John W. Douglas and Messrs. David G. Bress, U. S. Atty., and David L. Rose, Atty., Dept. of Justice, were on the brief, for appellee.

Before DANAHER, WRIGHT and McGOW-AN, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This appeal involves a voyage charter between Transatlantic Financing Corporation, operator of the SS CHRISTOS, and the United States covering carriage of a full cargo of wheat from a United States Gulf port to a safe port in Iran. The District Court dismissed a libel filed by Transatlantic against the United States for costs attributable to the ship's diversion from the normal sea route caused by the closing of the Suez Canal. We affirm.

On July 26, 1956, the Government of Egypt nationalized the Suez Canal Company and took over operation of the Canal. On October 2, 1956, during the international crisis which resulted from the seizure, the voyage charter in suit was executed between representatives of Transatlantic and the United States. The charter indicated the termini of the voyage but not the route. On October 27, 1956, the SS CHRISTOS sailed from Galveston for Bandar Shapur, Iran, on a course which would have taken her through Gibraltar and the Suez Canal. On October 29, 1956, Israel invaded Egypt. On October 31, 1956, Great Britain and France invaded the Suez Canal Zone. On November 2, 1956, the Egyptian Government obstructed the Suez Canal with sunken vessels and closed it to traffic.

On or about November 7, 1956, Beckmann, representing Transatlantic, contacted Potosky, an employee of the United States Department of Agriculture, who appellant concedes was unauthorized to bind the Government, requesting instructions concerning disposition of the cargo and seeking an agreement for payment of additional compensation for a voyage around the Cape of Good Hope. Potosky advised Beckmann that Transatlantic was expected to perform the charter according to its terms, that he did not believe Transatlantic was entitled

to additional compensation for a voyage around the Cape, but that Transatlantic was free to file such a claim. Following this discussion, the CHRISTOS changed course for the Cape of Good Hope and eventually arrived in Bandar Shapur on December 30, 1956.

Transatlantic's claim is based on the following train of argument. The charter was a contract for a voyage from a Gulf port to Iran. Admiralty principles and practices, especially stemming from the doctrine of deviation, require us to imply into the contract the term that the voyage was to be performed by the "usual and customary" route. The usual and customary route from Texas to Iran was, at the time of contract, via Suez, so the contract was for a voyage from Texas to Iran via Suez. When Suez was closed this contract became impossible to perform. Consequently, appellant's argument continues, when Transatlantic delivered the cargo by going around the Cape of Good Hope, in compliance with the Government's demand under claim of right, it conferred a benefit upon the United States for which it should be paid in *quantum meruit*.

The doctrine of impossibility of performance has gradually been freed from the earlier fictional and unrealistic strictures of such tests as the "implied term" and the parties' "contemplation." Page, *The Development of the Doctrine of Impossibility of Performance,* 18 MICH.L.REV. 589, 596 (1920). See generally 6 CORBIN, CONTRACTS §§ 1320–1372 (rev.ed. 1962); 6 WILLISTON, CONTRACTS §§ 1931–1979 (rev. ed. 1938). It is now recognized that " 'A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' " Mineral Park Land Co. v. Howard, 172 Cal. 289, 293, 156 P. 458, 460, L.R.A. 1916F, 1 (1916). *Accord,* Whelan v. Griffith Consumers Company, D.C.Mun.App., 170 A.2d 229 (1961); RESTATEMENT, CONTRACTS § 454 (1932); UNIFORM COMMERCIAL CODE (U.L.A.) § 2–615, comment 3. The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance.[1] When the issue is raised, the court is asked to construct a condition of performance[2] based on the changed circumstances, a process which involves at least three reasonably definable steps. First, a contingency—something unexpected—must have occurred. Second, the risk of the unexpected occurrence must not have been allocated either by agreement or by custom. Finally, occurrence of the contingency must have rendered performance commercially impracticable.[3] Un-

1. While the impossibility issue rarely arises, as it has here, in a suit to recover the cost of an alternative method of performance, compare Annot., 84 A.L.R.2d 12, 19 (1962), there is nothing necessarily inconsistent in claiming commercial impracticability for the method of performance actually adopted; the concept of impracticability assumes performance was physically possible. Moreover, a rule making nonperformance a condition precedent to recovery would unjustifiably encourage disappointment of expectations.

2. Patterson, *Constructive Conditions in Contracts,* 42 COLUM.L.REV. 903, 943–954 (1942).

3. Compare UNIFORM COMMERCIAL CODE § 2–615(a), which provides that, in the absence of an assumption of greater lia-bility, delay or non-delivery by a seller is not a breach if performance as agreed is made "impracticable" by the occurrence of a "contingency" the non-occurrence of which was a "basic assumption on which the contract was made." To the extent this limits relief to "unforeseen" circumstances, comment 1, see the discussion below, and compare UNIFORM COMMERCIAL CODE § 2–614(1). There may be a point beyond which agreement cannot go, UNIFORM COMMERCIAL CODE § 2–615, comment 8, presumably the point at which the obligation would be "manifestly unreasonable," § 1–102(3), in bad faith, § 1–203, or unconscionable, § 2–302. For an application of these provisions see Judge Friendly's opinion in United States v. Wegematic Corporation, 2 Cir., 360 F.2d 674 (1966).

less the court finds these three requirements satisfied, the plea of impossibility must fail.

■ The first requirement was met here. It seems reasonable, where no route is mentioned in a contract, to assume the parties expected performance by the usual and customary route at the time of contract.[4] Since the usual and customary route from Texas to Iran at the time of contract[5] was through Suez, closure of the Canal made impossible the expected method of performance. But this unexpected development raises rather than resolves the impossibility issue, which turns additionally on whether the risk of the contingency's occurrence had been allocated and, if not, whether performance by alternative routes was rendered impracticable.[6]

■ Proof that the risk of a contingency's occurrence has been allocated may be expressed in or implied from the agreement. Such proof may also be found in the surrounding circumstances, including custom and usages of the trade. See 6 CORBIN, *supra*, § 1339, at 394–397; 6 WILLISTON, *supra*, § 1948, at 5457–5458. The contract in this case does not expressly condition performance upon avail-

4. UNIFORM COMMERCIAL CODE § 2–614, comment 1, states: "Under this Article, in the absence of specific agreement, the normal or usual facilities enter into the agreement either through the circumstances, usage of trade or prior course of dealing." So long as this sort of assumption does not necessarily result in construction of a condition of performance, it is idle to argue over whether the usual and customary route is an "implied term." The issue of impracticability must eventually be met. One court refused to imply the Suez route as a contract term, but went on to rule the contract had been "frustrated." Carapanayoti & Co. Ltd. v. E. T. Green Ltd., [1959] 1 Q.B. 131. The holding was later rejected by the House of Lords. Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H., [1960] 2 Q.B. 348.

5. The parties have spent considerable energy in disputing whether the "usual and customary" route by which performance was anticipated is defined as of the time of contract or of performance. If we were automatically to treat the expected route as a condition of performance, this matter would be crucial, and we would be compelled to choose between unacceptable alternatives. If we assume as a constructive condition the usual and customary course always to mean the one in use at the time of contract, any substantial diversion (we assume the diversion would have to be substantial) would nullify the contract even though its effect upon the rights and obligations of the parties is insignificant. Nor would it be desirable, on the other hand, to assume performance is conditioned on the availability of *any* usual and customary route at the time of performance. It may be that very often the availability of a customary route at the time of performance other than the route expected to be used at the time of contract should result in denial of relief under the impossibility theory; certainly if *no* customary route is available at the time of performance the contract is rendered impossible. But the same customarily used alternative route may be practicable in one set of circumstances and impracticable in another, as where the goods are unable to survive the extra journey. Moreover, the "time of performance" is no special point in time; it is every moment in a performance. Thus the alternative route, in our case around the Cape, may be practicable at some time during performance, for example while the vessel is still in the Atlantic Ocean, and impracticable at another time during performance, for example after the vessel has traversed most of the Mediterranean Sea. Both alternatives, therefore, have their shortcomings, and we avoid choosing between them by refusing automatically to treat the usual and customary route as of any time as a condition of performance.

6. In criticizing the "contemplation" test for impossibility Professor Patterson pointed out:

" 'Contemplation' is appropriate to describe the mental state of philosophers but is scarcely descriptive of the mental state of business men making a bargain. It seems preferable to say that the promisee *expects* performance by [the] means * * * the promisor expects to (or which on the facts known to the promisee it is probable that he will) use. It does not follow as an inference of fact that the promisee expects performance by *only* that means * * *." Patterson, *supra* Note 2, at 947.

ability of the Suez route. Nor does it specify "via Suez" or, on the other hand, "via Suez or Cape of Good Hope." [7] Nor are there provisions in the contract from which we may properly imply that the continued availability of Suez was a condition of performance.[8] Nor is there anything in custom or trade usage, or in the surrounding circumstances generally, which would support our constructing a condition of performance. The numerous cases requiring performance around the Cape when Suez was closed, see *e. g.*, Ocean Tramp Tankers Corp. v. V/O Sovfracht (The Eugenia), [1964] 2 Q.B. 226, and cases cited therein, indicate that the Cape route is generally regarded as an alternative means of performance. So the implied expectation that the route would be via Suez is hardly adequate proof of an allocation to the promisee of the risk of closure. In some cases, even an express expectation may not amount to a condition of performance.[9] The doc-

7. In Glidden Company v. Hellenic Lines, Limited, 2 Cir., 275 F.2d 253 (1960), the charter was for transportation of materials from India to America "via Suez Canal or Cape of Good Hope, or Panama Canal," and the court held performance was not "frustrated." In his discussion of this case, Professor Corbin states: "Except for the provision for an alternative route, the defendant would have been discharged, for the reason that the parties contemplated an open Suez Canal as a specific condition or means of performance." 6 CORBIN, *supra*, § 1339, at 399 n. 57. Appellant claims this supports its argument, since the Suez route was contemplated as usual and customary. But there is obviously a difference, in deciding whether a contract allocates the risk of a contingency's occurrence, between a contract specifying no route and a contract specifying Suez. We think that when Professor Corbin said, "Except for the provision for an alternative route," he was referring, not to the entire *provision*—"via Suez Canal or Cape of Good Hope" etc.—but to the fact that *an alternative route* had been provided for. Moreover, in determining what Corbin meant when he said "the parties contemplated an open Suez Canal as a specific condition or means of performance," consideration must be given to the fact, recited by Corbin, that in *Glidden* the parties were specifically aware when the contract was made the Canal might be closed, and the promisee had refused to include a clause excusing performance in the event of closure. Corbin's statement, therefore, is most accurately read as referring to cases in which a route is specified after negotiations reflecting the parties' awareness that the usual and customary route might become unavailable. Compare Held v. Goldsmith, 153 La. 598, 96 So. 272 (1919).

8. The charter provides that the vessel is "in every way fitted for *the voyage*" (emphasis added), and the "P. & I. Bunker Deviation Clause" refers to "the contract voyage" and the "direct and/or customary route." Appellant argues that these provisions require implication of a voyage by the direct and customary route. Actually they prove only what we are willing to accept—that the parties expected the usual and customary route would be used. The provisions in no way condition performance upon non-occurrence of this contingency.

There are two clauses which allegedly demonstrate that time is of importance in this contract. One clause computes the remuneration "in steaming time" for diversions to other countries ordered by the charterer in emergencies. This proves only that the United States wished to reserve power to send the goods to another country. It does not imply in any way that there was a rush about the matter. The other clause concerns demurrage and despatch. The charterer agreed to pay Transatlantic demurrage of $1,200 per day for all time in excess of the period agreed upon for loading and unloading, and Transatlantic was to pay despatch of $600 per day for any saving in time. Of course this provision shows the parties were concerned about time, see GILMORE & BLACK, THE LAW OF ADMIRALTY § 4–8 (1957), but the fact that they arranged so minutely the consequences of any delay or speedup of loading and unloading operates against the argument that they were similarly allocating the risk of delay or speed-up of the voyage.

9. UNIFORM COMMERCIAL CODE § 2–614(1) provides: "Where without fault of either party * * * the *agreed* manner of delivery * * * becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted." (Emphasis added.) Compare Mr. Justice Holmes' observation: "You can give any conclusion a logical form.

trine of deviation supports our assumption that parties normally expect performance by the usual and customary route, but it adds nothing beyond this that is probative of an allocation of the risk.[10]

If anything, the circumstances surrounding this contract indicate that the risk of the Canal's closure may be deemed to have been allocated to Transatlantic. We know or may safely assume that the parties were aware, as were most commercial men with interests affected by the Suez situation, see The Eugenia, *supra,* that the Canal might become a dangerous area. No doubt the tension affected freight rates, and it is arguable that the risk of closure became part of the dickered terms. UNIFORM COMMERCIAL CODE § 2–615, comment 8.

We do not deem the risk of closure so allocated, however. Foreseeability or even recognition of a risk does not necessarily prove its allocation.[11] Compare UNIFORM COMMERCIAL CODE § 2–615, Comment 1; RESTATEMENT, CONTRACTS § 457 (1932). Parties to a contract are not always able to provide for all the possibilities of which they are aware, sometimes because they cannot agree, often simply because they are too busy. Moreover, that some abnormal risk was contemplated is probative but does not necessarily establish an allocation of the risk of the contingency which actually occurs. In this case, for example, nationalization by Egypt of the Canal Corporation and formation of the Suez Users Group did not necessarily indicate that the Canal would be blocked even if a confrontation resulted.[12] The

You always can imply a condition in a contract. But why do you imply it? It is because of some belief as to the practice of the community or of a class, or because of some opinion as to policy * * *." Holmes, *The Path of the Law,* 10 HARV.L.REV. 457, 466 (1897).

10. The deviation doctrine, drawn principally from admiralty insurance practice, implies into all relevant commercial instruments naming the termini of voyages the usual and customary route between those points. 1 ARNOULD, MARINE INSURANCE AND AVERAGE § 376, at 522 (10th ed. 1921). Insurance is cancelled when a ship unreasonably "deviates" from this course, for example by extending a voyage or by putting in at an irregular port, and the shipowner forfeits the protection of clauses of exception which might otherwise have protected him from his common law insurer's liability to cargo. See GILMORE & BLACK, *supra* Note 8, § 2–6, at 59–60. This practice, properly qualified, see *id.* § 3–41, makes good sense, since insurance rates are computed on the basis of the implied course, and deviations in the course increasing the anticipated risk make the insurer's calculations meaningless. ARNOULD, *supra,* § 14, at 26. Thus the route, so far as insurance contracts are concerned, is crucial, whether express or implied. But even here, the implied term is not inflexible. Reasonable deviations do not result in loss of insurance, at least so long as established practice is followed. See Carriage of Goods by Sea Act § 4(4), 49 STAT. 1210, 46 U.S.C.

§ 1304(4); and discussion of "held covered" clauses in GILMORE & BLACK, *supra,* § 3–41, at 161. Some "deviations" are required. *E. g.,* Hirsch Lumber Co. v. Weyerhaeuser Steamship Co., 2 Cir., 233 F.2d 791, *cert. denied,* 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956). The doctrine's only relevance, therefore, is that it provides additional support for the assumption we willingly make that merchants agreeing to a voyage between two points expect that the usual and customary route between those points will be used. The doctrine provides no evidence of an allocation of the risk of the route's unavailability.

11. See Note, *The Fetish of Impossibility in the Law of Contracts,* 53 COLUM. L.REV. 94, 98 n. 23 (1953), suggesting that foreseeability is properly used "as a *factor* probative of assumption of the risk of impossibility." (Emphasis added.)

12. Sources cited in the briefs indicate formation of the Suez Canal Users Association on October 1, 1956, was viewed in some quarters as an implied threat of force. See N.Y. Times, Oct. 2, 1956, p. 1, col. 1, noting, on the day the charter in this case was executed, that "Britain has declared her freedom to use force as a last resort if peaceful methods fail to achieve a satisfactory settlement." Secretary of State Dulles was able, however, to view the statement as evidence of the canal users' "dedication to a just and peaceful solution." THE SUEZ PROBLEM 369–370 (Department of State Pub. 1956).

surrounding circumstances do indicate, however, a willingness by Transatlantic to assume abnormal risks, and this fact should legitimately cause us to judge the impracticability of performance by an alternative route in stricter terms than we would were the contingency unforeseen.

We turn then to the question whether occurrence of the contingency rendered performance commercially impracticable under the circumstances of this case. The goods shipped were not subject to harm from the longer, less temperate Southern route. The vessel and crew were fit to proceed around the Cape.[13] Transatlantic was no less able than the United States to purchase insurance to cover the contingency's occurrence. If anything, it is more reasonable to expect owner-operators of vessels to insure against the hazards of war. They are in the best position to calculate the cost of performance by alternative routes (and therefore to estimate the amount of insurance required), and are undoubtedly sensitive to international troubles which uniquely affect the demand for and cost of their services. The only factor operating here in appellant's favor is the added expense, allegedly $43,972.00 above and beyond the contract price of $305,842.92, of extending a 10,000 mile voyage by approximately 3,000 miles. While it may be an overstatement to say that increased cost and difficulty of performance never constitute impracticability, to justify relief there must be more of a variation between expected cost and the cost of performing by an available alternative than is present in this case,[14] where the promisor can legitimately be presumed to have accepted some degree of abnormal risk, and where impracticability is urged on the basis of added expense alone.[15]

We conclude, therefore, as have most other courts considering related issues arising out of the Suez closure,[16] that

13. The issue of impracticability should no doubt be "an objective determination of whether the promise can reasonably be performed rather than a subjective inquiry into the promisor's capability of performing as agreed." Symposium, *The Uniform Commercial Code and Contract Law: Some Selected Problems*, 105 U. PA.L.REV. 836, 880, 887 (1957). Dealers should not be excused because of less than normal capabilities. But if both parties are aware of a dealer's limited capabilities, no objective determination would be complete without taking into account this fact.

14. Two leading English cases support this conclusion. The Eugenia, *supra*, involved a time charter for a trip from Genoa to India via the Black Sea. The charterers were held in breach of the charter's war clause by entering the Suez Canal after the outbreak of hostilities, but sought to avoid paying for the time the vessel was trapped in the Canal by arguing that, even if they had not entered the Canal, it would have been blocked and the vessel would have had to go around the Cape to India, a trip which "frustrated" the contract because it constituted an entirely different venture from the one originally contemplated. The lower court agreed, but the House of Lords (see Lord Denning's admirable treatment, [1964] 2 Q.B. at 233), "swallowing" the difficulty of applying the frustration doctrine to hypothetical facts, reversed, holding that the contract had to be performed. Especially relevant is the fact that the case expressly overruled Societe Franco Tunisienne D'Armement v. Sidermar S.P.A. (The Massalia), [1961] 2 Q.B. 278, where a voyage charter was deemed frustrated because the Cape route was "highly circuitous" and cost 195s. per long ton to ship iron ore, rather than 134s. via Suez, a difference well in excess of the difference in this case.

In Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H., *supra* Note 4, the difference to the seller under a C.I.F. contract in freight costs caused by the Canal's closure was £15 per ton instead of £7.10s. per ton—precisely twice the cost. The House of Lords found no frustration.

15. See UNIFORM COMMERCIAL CODE § 2–615, comment 4: "Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance." See also 6 CORBIN, *supra*, § 1333; 6 WILLISTON, *supra*, § 1952, at 5468.

16. Appellant seeks to distinguish the English cases supporting our view. The Eugenia, *supra*, appellant argues, involved a time charter. True, but it overruled The Massalia, *supra* Note 14, which in-

performance of this contract was not rendered legally impossible. Even if we agreed with appellant, its theory of relief seems untenable. When performance of a contract is deemed impossible it is a nullity. In the case of a charter party involving carriage of goods, the carrier may return to an appropriate port and unload its cargo, The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928), subject of course to required steps to minimize damages. If the performance rendered has value, recovery in *quantum meruit* for the entire performance is proper. But here Transatlantic has collected its contract price, and now seeks *quantum meruit* relief for the additional expense of the trip around the Cape. If the contract is a nullity, Transatlantic's theory of relief should have been *quantum meruit* for the entire trip, rather than only for the extra expense. Transatlantic attempts to take its profit on the contract, and then force the Government to absorb the cost of the additional voyage.[17] When impracticability without fault occurs, the law seeks an equitable solution, see 6 CORBIN, *supra*, § 1321, and *quantum meruit* is one of its potent devices to achieve this end. There is no interest in casting the entire burden of commercial disaster on one party in order to preserve the other's profit. Apparently the contract price in this case was advantageous enough to deter appellant from taking a stance on damages consistent with its theory of liability. In any event, there is no basis for relief.

Affirmed.

volved a voyage charter. Indeed, when the time charter is for a voyage the difference is only verbal. See CARVER, CARRIAGE OF GOODS BY SEA 256–257 (10th ed. 1957). More convincing is the argument that *Tsakiroglou & Co. Ltd., supra* Note 4, involved a contract for the sale of goods, where the seller agreed to a C.I.F. clause requiring him to ship the goods to the buyer. There is a significant difference between a C.I.F. contract and voyage or time charters. The effect of delay in the former due to longer sea voyages is minimized, since the seller can raise money on the goods he has shipped almost at once, and the buyer, once he takes up the documents, can deal with the goods by transferring the documents before the goods arrive. See *Tsakiroglou & Co. Ltd., supra* Note 4, [1960] 2 Q.B. at 361. But this difference is not so material that impossibility in C.I.F. contracts is unrelated to impossibility in charter parties. It would raise serious questions for a court to require sellers under C.I.F. contracts to perform in circumstances under which the sellers could be refused performance by carriers with whom they have entered into charter parties for affreightment. See The Eugenia, *supra*, [1964] 2 Q.B. at 241. Where the time of the voyage is unimportant, a charter party should be treated the same as a C.I.F. contract in determining impossibility of performance.

These cases certainly are not distinguishable, as appellant suggests, on the ground that they refer to "frustration" rather than to "impossibility." The English regard "frustration" as substantially identical with "impossibility." 6 CORBIN, *supra*, § 1322, at 327 n. 9.

17. The argument that the UNIFORM COMMERCIAL CODE requires the buyer to pay the additional cost of performance by a commercially reasonable substitute was advanced and rejected in Symposium, *supra* Note 13, 105 U.PA.L.REV. at 884 n. 205. In Dillon v. United States, 156 F.Supp. 719, 140 Ct.Cl. 508 (1957), relief was afforded for some of the cost of delivering hay from a commercially unreasonable distance, but the suit was one in which the plaintiff had suffered losses far in excess of the relief given.