**AMERICAN TRADING AND PRODUCTION CORPORATION, Plaintiff, Cross Defendant,**

v.

**SHELL INTERNATIONAL MARINE, LIMITED, Defendant, Cross Plaintiff,**

**No. 69 Civ. 5517.**

United States District Court,
S. D. New York.

July 22, 1971.

Burlingham, Underwood, Wright, White & Lord, New York City, by Herbert M. Lord, and Frederick M. Sevekow, Jr., New York City, for plaintiff.

Haight, Gardner, Poor & Havens, New York City, by MacDonald Deming, and Steven B. Chameides, New York City, for defendant.

## OPINION

TYLER, District Judge.

This case adds another chapter to the continuing saga of Suez Canal closings and resultant litigations. Plaintiff, American Trading and Production Corporation ("owner"), sues for extra monies expended by Cape of Good Hope passage after closure of the canal in June, 1967. Defendant charterer, Shell International Marine, Limited ("Shell") denies liability for such extra charges and also asserts a cross claim for damages attributable to unused Suez Canal tolls. The case was tried on submitted facts, and for reasons to be hereinafter indicated, it is concluded that neither the owner nor Shell is entitled to recover on their respective claims. See, generally, Transatlantic Financing Corporation v. United States, 124 U.S.App.D.C. 183, 363 P.2d 312 (1966).

From the submitted facts, the following summary can be conveniently and relevantly made. The owner is a corporation organized under Maryland law and maintaining a principal office and place of business within this judicial district. Shell is and was a corporation duly organized under United Kingdom law. On March 23, 1967, in New York City, owner and Shell executed a contract voyage charter, by the terms of which Shell hired owner's tank vessel WASHINGTON TRADER ("TRADER") for a voyage with a full cargo of lube oil from "Maximum three safe ports, at Charterer's option, U. S. Gulf"

to Bombay, India. It was further provided in the charter party that the freight rate stipulated by the parties was "[i]n accordance with (the) American Tanker Rate Schedule (ATRS) plus Seventy-Five Percent (+75%)."

On or about May 15, 1967, the TRADER departed Beaumont with a cargo of 16,183.32 long tons of lube loaded there and at Smith's Bluff bound for Bombay. On the following day, owner submitted to Shell its invoice of charges covering the voyage in the amount of $417,327.36. Shell responded rather promptly to this invoice by sending its check for the full amount which was duly received by the owner on May 26, 1967.

The TRADER arrived at, bunkered and departed Freeport, Bahamas on May 19, 1967. It then proceeded to cross the Atlantic with no untoward events until May 29th, when the master received a radio message from the owner advising him to "take additional bunkers at Ceuta due to possible diversion because of Suez Canal crisis". Thus, when the TRADER arrived at Ceuta at 2300 hours (GMT) on May 30th, it bunkered and left the following morning, May 31, at 0740 hours (GMT).

On June 2, the master of the TRADER advised the owner by radio that his estimated time of arrival at the Suez Canal entrance was 2300 hours on June 5, 1967. At 0840 hours on June 5th, the owner received another radio message from the TRADER indicating an estimated time of arrival at Port Said at 1600 hours (EDT) on June 5th. Several hours later on the same day, the owner sent the following radio message to the master of the TRADER:

"Immediately radio American Consul Port Said cable address AMCONSUL Port Said current position and ETA Canal Stop Keep him and this office closely informed your movements until you safely transit Canal."

Still later that day of June 5th, the owner sent another cable to the master advising him of various reports of trouble in the canal area and suggesting, subject to the master's discretion, that he delay entering the canal "pending clarification situation". At some time on the same day of June 5th, as a consequence of the state of war between Israel and Egypt, the Suez Canal was closed to all traffic.

On the morning of June 5th, the owner had telephoned a Mr. Tourelle of Dietze, Inc., the broker which had negotiated the charter party in question, requesting that because of the outbreak of war in the Middle East, he communicate with Shell to obtain Shell's approval for diversion of the TRADER. Immediately after that call, Mr. Tourelle got back to the owner with the word that he had spoken to a Mr. Hennessy of Asiatic Petroleum, Inc. Hennessy, acting as Shell's agent, reported that it was Shell's position that the owner had to decide what to do with the TRADER and her cargo. On that day, June 5th, it is relevant to note that the TRADER had proceeded to a point about 84 miles northwest of Port Said and had dropped anchor there. In other words, the TRADER then was about 84 miles away from the northern entrance of the Suez Canal.

The following day, June 6, the owner received through Tourelle the following message from Shell:

"WASHINGTON TRADER understand Suez Canal closed all traffic. We assume vessel is waiting outside Canal. In these circumstances, it is for owner to decide whether to continue to wait or make the alternative passage via the Cape since charter party obliges them to deliver cargo without qualification. Please let us know what Owners decide."

Approximately one hour later, the owner ordered the master of the TRADER to proceed to Bombay via the Cape of Good Hope. At or shortly after that direction to the master, the owner sent the following message to Shell:

"In view of Suez Canal closed WASHINGTON TRADER proceeding Bombay via Cape Good Hope. We reserving all rights for extra compensation."

On July 15, the TRADER arrived at Bombay and discharged her cargo thereafter.

By a letter dated July 3, 1967, the owner formally and in writing billed Shell for "additional compensation" in the amount of $131,978.44.[1] Shell by a letter dated July 11 refused payment of this extra compensation as demanded by the owner.

In its counterclaim in this action filed on or about September 22, 1970, Shell demanded repayment by the owner of the sum of $13,755.82 representing the fixed differential for Suez Canal tolls which had been specifically included in the sum previously paid by Shell to the owner.

As the parties agree, the distance from Beaumont/Smith's Bluff to Bombay via the canal is 9,709 miles, whereas the distance from the same ports to a position within 84 miles of Port Said is 6,554 miles. It is further stipulated that the course actually traveled by the TRADER from Beaumont to a point 84 miles northwest of Port Said to Bombay via the Cape of Good Hope is 18,055 miles.

The parties have further stipulated that ATRS rates are calculated as follows: For a given voyage, the number of days required is estimated, taking into account both steaming time and time in port. Steaming time is computed on the basis of estimated sailing distance divided by the speed of the standard T–2 tanker, the time in port upon the established laytime scales. The total estimated number of days is then multiplied by a theoretical daily return of $2,500. To this amount is added port charges at the ports to be used (as of 1953) and estimated costs of bunkers which is computed by the formula $Distance$ Rate of consumption $\times$ Cost per barrel (1953) = Cost of bunkers. Adding these three amounts gives a total "freight" which is then divided by the tonnage deadweight of the standard T–2 tanker (total deadweight less necessary bunkers, water, stores, etc.). The result is the "freight rate" per ton of cargo carried. See Second Stipulation, Para. 1; see also First Stipulation, Exhibits B and C. This method provides a convenient reference for bargaining, in terms of percentage up or down, depending on the condition of the market at any given time. In this case, the actual negotiated rate, as pointed out above, was ATRS plus 75%.

On the date when this charter party was executed and until sometime after June 5, 1967, there was only one ATRS rate for a voyage from Beaumont/Smith's Bluff to Bombay. This was the $14.25 per longton of cargo carried, as provided on the appropriate schedule of the American Tanker Rate Schedule, Second Edition, 1961. The parties have stipulated that if a rate had been requested on March 23, 1967, or at any time thereafter, from the Association of Ship Brokers and Agents for a voyage from Beaumont/Smith's Bluff to Bombay, via the Cape of Good Hope, that agency would have computed the rate at $17.35 per long-ton of cargo carried. It is also conceded by the parties that the estimated sailing distance used in the computation of the aforesaid rate of $14.25 for a trip from Beaumont/Smith's Bluff to Bombay was the estimated sailing distance for a voyage via the Suez Canal.

The owner asserts that it is entitled to additional compensation because the charter party contained an implied condition of transit via Suez and that performance of the charter party containing such a condition was rendered impossible or was "frustrated" by closure of the Suez Canal. Secondarily, the owner urges that even if it should be

---

1. The owner's computation of this "extra compensation" is to be found in Exhibit C attached to the First Stipulation of Facts. Shell agrees that this computation is mathematically correct but denies any such obligation; secondarily, Shell maintains that, in the event it is held liable then owner has maintained an improper theory of damages. See Transatlantic Financing Corporation v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312, at 320 (1966).

held that transiting the canal was not an agreed condition or means of performance, closure of the canal with the TRADER only 84 miles away from the northern entry thereof rendered performance of the contract commercially impracticable. Finally, it is urged that the so-called "Liberties Clause" in the charter party entitles the owner to additional compensation under the circumstances of this case.

Shell submits that transit via the Suez Canal was not a condition, express or implied, of the contract, nor was the voyage via the Cape of Good Hope a commercial impracticability requiring payment of extra compensation to the owner. Furthermore, Shell argues that the Liberties Clause of the charter party is not applicable to the facts of this case.

As already indicated, I believe that Shell's arguments are supported by controlling case law and thus the owner is not entitled to recover. Further, I conclude that resolution of Shell's cross claim for the Suez tolls paid by Shell to owner but obviously not expended by the TRADER for that purpose must await further submissions by the parties.

### I.

#### Owner's Claim

■ Contrary to the owner's arguments, there was no express or implied condition for transit via the Suez Canal in the charter party negotiated and executed on March 23, 1967. Concededly, the written charter terms are silent on the subject of the route to be followed by the TRADER from the point of loading to the point of discharge. As Shell points out, virtually all of the facts or circumstances to which owner points in support of its theory of an implied condition are matters unilaterally determined by the owner once the charter party was signed and the voyage commenced and was underway. To be sure, it is implicit from the stipulated facts that both sides expected that the TRADER's passage would be made via the Suez Canal. The basic ATRS rate was computed on this basis, and Shell paid owner the amount of the Suez tolls as billed by owner after the contract was executed. But these facts do not support or lead to a finding of an express or implied condition of passage by the canal. Transatlantic Financing Corporation v. United States ("The Christos"), 124 U.S.App.D.C. 183, 363 F.2d 312 (1966).

■ Apparently contemplating that this court would find that there was no express or implied condition of transit via the Suez, owner's counsel in their excellent brief attempt to take advantage of the so-called doctrine of frustration or commercial impracticability referred to frequently in American and British admiralty cases. Again, *The Christos*, the operative facts of which I have great difficulty in distinguishing from those at hand, is clearly against the position of the owner here. See 363 F.2d at pp. 316–317.

■ Owner's reliance upon the impossibility or commercial impracticability rule as set forth, for example, in the Restatement of Contracts, Sec. 460, is misplaced. The overwhelming weight of English and American authority is to the effect that added cost, such as was obviously required for passage via the Cape of Good Hope, is insufficient without more to make out a case of frustration or commercial impossibility. See, also, Uniform Commercial Code, Sec. 2–615, Comment 4, to the effect that:

> "Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance."

In this case, it seems clear that both sides were aware that there was only one ATRS rate for passage from the Gulf ports to Bombay and that that basic rate was based upon the canal route. On the other hand, it is not unreasonable to suppose that a factor in the market leading the parties to add 75% to the ATRS rate was the possibility that

the canal might not be open for this particular shipment. If this were not so, at the very least the 75% override suggests that added cost, aside and apart from the law, does not work an overwhelming hardship upon the owner. Furthermore, the owner makes no claim that the cargo was endangered by the longer passage, or the TRADER was not fit for a voyage around the Cape of Good Hope, or the crew was unfit for such a voyage, or there was any other circumstances or fact leading toward a finding of impossibility. *The Christos, supra,* 363 F.2d at 319.

As is well known, the English courts have had occasions in recent years to hold that added expense for the Cape route as an alternative means of performance when the canal is closed does not require application of the doctrine of frustration or commercial impossibility as the owner here argues. (The "Eugenia") Ocean Tramp Tankers Corp. v. V/O Sovfracht, (1964) 2 O.B. 226; Tsakiroglou & Co. Ltd. v. Nobles Thorl G. m. b. H, (1960) 2 Q.B. 348. These decisions of the House of Lords have been followed by most American courts to date. Transatlantic Financing Corporation v. United States, *supra;* see also Glidden Company v. Hellenic Lines, Ltd., 275 F.2d 253 (2d Cir. 1960). Thus, the owner's reliance on such cases as *Glidden, supra,* is misplaced because the Second Circuit Court of Appeals specifically recognized and accepted the rationale of *The Eugenia* and *Tsakiroglou* in refusing to apply the doctrine of frustration upon a determination that the charter parties contained specific provisions of an alternative route via the Cape of Good Hope.

■ Nor is the owner entitled extra compensation under the Liberties Clause of the charter party which is contained in paragraph 28(a) of Part 2 thereof. That clause provides:

"LIBERTY CLAUSES. (a) In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Owner or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the Vessel or any part of her cargo, or to it unsafe, imprudent, or unlawful for any reason to commence or proceed or continue the voyage or to enter or discharge the cargo at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, the Owner may before loading or before commencement of the voyage, require the shipper or other person entitled thereto to take delivery of the cargo at port of shipment and upon their failure to do so, may warehouse the cargo at the risk and expense of the cargo, or the Owner or Master, whether or not proceeding toward or entering or attempting to reach the usual place of discharge therein or attempting to discharge the cargo there, may discharge the cargo into depot, lazaretto, craft or other place; or the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances, and discharge the cargo, or any part thereof, at any port or place; or the Owner or the Master may retain the cargo on board until the return trip or until such time as the Owner or the Master thinks advisable and discharge the cargo at any place whatsoever as herein provided or the Owner or the Master may discharge and forward the cargo by any means at the risk and expense of the cargo. The Owner may, when practicable, have the Vessel call and discharge the cargo at another or substitute port declared or requested by the Charterer. The Owner or the Master is not required to give notice of discharge of the cargo, or the forwarding thereof as herein provided. When the cargo is discharged from the Vessel, as herein provided, it shall

be at its own risk and expense; such discharge shall constitute complete delivery and performance under this contract and the Owner shall be freed from any further responsibility. For any service rendered to the cargo as herein provided the Owner shall be entitled to a reasonable extra compensation."

As Shell argues, it seems quite clear that the Liberties Clause adverted to by the owner was not intended or designed to apply where delivery of the cargo can be and is in fact made to the contractually designated port of discharge. In brief, this Clause appears to be designed to cover situations where the vessel or its cargo encounters, during the voyage or discharge of the cargo, unexpected hazards, detentions, delays or threats of seizure or destruction. In other words, this language appears to confer upon the master of the vessel certain discretionary powers when circumstances unexpected and beyond control of the owner threaten the security of the vessel or cargo, including the right to proceed or return, or to stop at any safe port, or to discharge the cargo at any safe place or port. The Clause finally concludes with language freeing the owner of all responsibility when the vessel master has discharged the cargo at a place or port under the aforesaid discretionary powers. In the context of this case, such language is obviously inapplicable. To illustrate, if it were applied to the facts of the case at bar, the owner could have freed itself of any responsibility by ordering the master of the TRADER to discharge the lube oil at any convenient port other than Bombay, a result which surely would have been contested by Shell with considerable likelihood of success.

In my view, a more reasonable construction of this Liberties Clause is that offered by Shell—i. e. it is principally intended to compensate and/or hold harmless the owner when it renders unusual protection or services to the cargo in transit or at any port or place. Obvious examples of such service would be transferring the cargo to another vessel or lighter, the hiring of extra stevedores, the hiring of extra port watchmen to protect and watch the cargo, etc. See Poor on Charter Parties, Sec. 69 at pp. 205–206.

## II.

### Shell's Cross Claim

For whatever reasons, the parties, especially the owner, have devoted little attention or discussion to Shell's cross claim for $13,755.82, that portion of the total freight charges allocated by the owner on its bill or invoice for Suez tolls. This amount concededly was based on the 85¢ fixed differential per ton of cargo which, pursuant to ATRS, was to be added to the rate over and above other freight charges for voyages "incurring passage" of the canal. The owner has deducted this part of the charge as a credit against the extra compensation which it claims in this suit.

Shell, in its brief treatment of the issue, simply argues that since the TRADER did not transit the canal, it follows that the tolls portion of the total "freight" paid should be remitted by the owner. The latter and its counsel have not mentioned or briefed the question.

On the present record, I consider the question to be open. Perhaps Shell's postion is not only simple but correct; nevertheless, it might be argued from the owner's side that the tolls, though a specific line item on the owner's invoice, were in reality part of the total freight as stipulated by the parties in their contract. Thus, I believe that fairness requires this court to give counsel until August 20, 1971 to file briefs on this question.

In summary, therefore, it is ruled that the owner's claim must be dismissed on the merits. Entry of judgment accordingly should be deferred, however, pending opportunity for counsel to brief the issue of Shell's cross claim as aforesaid and for this court to file a further memorandum resolving that issue.