ASPHALT INTERNATIONAL, INC., Plaintiff,

v.

ENTERPRISE SHIPPING CORP., S.A., Defendant.

77 CIV 4711 (LBS).

United States District Court, S. D. New York.

May 18, 1981.

As Amended May 26, 1981.

---

**1112**

Boal, Doti & Larsen, New York City (Arthur M. Boal, Jr., New York City, of counsel), for plaintiff.

Healy & Baillie, New York City (Thomas L. Rohrer, John P. James, New York City, of counsel), for defendant.

## OPINION

SAND, District Judge.

The principal issue presented by this admiralty proceeding which has been tried to the Court, is whether the owner of a vessel on charter which was damaged in a collision may treat the vessel as a total wreck and be excused from further liability under the charter, either under the terms of the charter party or under the doctrine of impracticability of performance, where the reasonably estimated cost of repair exceeds the fair market value of the vessel prior to the collision but is less than the hull insurance proceeds received by the owner.

Unlike land based forms of insurance in which coverage is limited to the fair market value of that which is insured, marine hull insurance is not so limited. Thus, the Oswego Tarmac, a T–2 tanker converted to transport asphalt, which defendant alleges, and we find, had a fair market value of $750,000 in mid-1977, had marine hull insurance of $2,500,000. The ship sustained damages while alongside the pier in Curacao, when another vessel collided with it. There is no allegation or suggestion that the Oswego Tarmac, its owner, master, or crew, were in any way at fault. A joint field survey conducted by surveyors representing both vessels, a classification society, and the Oswego Tarmac's hull underwriters, estimated the cost of repair at $1,900,-000 and in any case, at not less than $1,500,-000.[1] The owner decided to follow the recommendation of its surveyor and scrap the vessel, ultimately collecting $157,500 from the scrapper. Also, the parties have stipulated that "[u]nderwriters of the marine risk hull and machinery policies have paid a net sum of $1,335,000 against the loss occasioned by the collision. . . ." Amended Pre-Trial Order at 5. The proceeds the owner received exceeded the fair market value of the vessel prior to the collision.

The Oswego Tarmac was at the time of the collision under a time charter to plaintiff. The charter party provided that, "Except as otherwise stated in this Charter . . . Owners shall provide and/or pay for all requirements . . . of whatsoever nature relating to the vessel . . . which shall include (1) . . . repairs . . .; (6) marine . . . insurance on the vessel. . . ." It also provided that,

**1.** Plaintiff has sought to impugn the results of the joint field survey and defendant's August 1977 decision to abandon the ship, by means of two subsequent surveys conducted in September and December of 1977 yielding repair estimates which were not in excess of the value of the ship. However, the facts as they reasonably appeared to the owner at the time right after the collision when a decision on repair versus abandonment was to be made, control. *Cf.* G. Gilmore and C. Black, The Law of Admiralty 84–85 & n.127 (2d ed. 1975). ("Thus, if the reasonable probability, at the time the assured tenders abandonment and elects to claim

for a constructive total loss, is that the cost of repair and like expenses will exceed the amount . . . required for the existence of the right to abandon, the abandonment is good and binds the underwriter, who must pay for a constructive total loss even though later events may show that the repair costs are less than the required amount." (Footnote omitted.)). In this case it was reasonable for defendant to rely on the joint field survey results. The surveyors included representatives of the colliding ship and of the Oswego Tarmac's insurer, interests adverse to defendant's.

Owners shall ... throughout the period of service under this Charter exercise due diligence to make and maintain the vessel tight, staunch, strong, in good order and condition, in every way fit for the service ... with the vessel's machinery, boilers and hull in such a state as to obtain the most economic working....

The charter party also had an Exceptions paragraph which stated that, "Vessel, her Master and Owner, shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage arising or resulting from: ... collision."[2] Finally, the charter party also provided that, "Should the vessel be lost, hire shall cease at noon on the day of her loss...."

Plaintiff asserts breach of the charter and claims damages in the amount of $1,278,831, representing loss of profits for voyages which plaintiff anticipates would have occurred and business which it anticipates it would have done, if defendant had repaired the ship. Plaintiff was not a beneficiary under the marine hull insurance policy, and makes no claim of entitlement to insurance proceeds as any sort of policy beneficiary.

Plaintiff argues that the charter party "specifically places responsibility for maintenance and repair upon the Defendant" and that the defendant breached by failing to effect such repair and scrapping the ship. Plaintiff also argues that defendant failed alternatively to supply a substitute vessel. Defendant responds: (1) that its performance was excused by the Exceptions paragraph of the charter party; (2) that under maritime law, its duty under the charter party to effect repairs is abrogated and the contract dissolved if the cost of repair exceeds the value of the repaired vessel (and, moreover, that the ship is then considered lost, a condition which under the charter party excuses further performance); (3) that because the cost of repair exceeded the value of the ship, defendant's performance should be excused under a theory of commercial impossibility or impracticability or frustration of performance; and (4) that plaintiff's damages claims are "speculative, remote and improperly calculated." Trial Memorandum of Defendant at 11.

The charter party on its face does not immediately resolve the matter. While it absolves the shipowner of liability for loss or damage resulting from collision, and in a separate paragraph terminates the hire if the vessel is "lost," it also establishes a duty to repair. The question is what is the limit on that duty to repair, and under what circumstances should the ship be considered "lost."

The concept of a constructive total loss provides guidance here. "Constructive total loss" has been variously defined to apply to the situation in which the cost of repair exceeds the repaired value of the ship, or half of its repaired value, or its insured value. *See* G. Gilmore, *supra* note 1, at 83–84. When a ship is a constructive total loss the shipowner may abandon the vessel and seek payment from the insurer. Thus, when a ship is a constructive total loss, one would not expect there to be a persisting duty to repair, unless the charter contained an explicit agreement to the contrary.

For the purpose of determining the shipowner's duty to repair, the Oswego Tarmac should be considered a total loss. The cost of repair, as set by the joint field survey, was more than twice the value of the ship without the collision damage. Moreover, the Oswego Tarmac was not a young ship with an expectation of substantial years of additional service. The vessel had been built in 1944 and converted to carry asphalt in 1973. Its period of certification by The American Bureau of Shipping was due to expire shortly, and it was anticipated that in order to pass reinspection and be recertified, the ship would require improvements.

2. The Exceptions paragraph also provided that, "This Article is not to be construed as in any way affecting the provisions for cessation of hire as provided in this Charter." The provisions for cessation of hire stated, "The vessel shall be off hire: A. in the event of loss of time continuing for more than 24 hours through: ... (4) accident or damage to the vessel including collision...."

While the estimated cost of repair did not exceed the insured value of the ship, that is $2,500,000, we do not find this controlling. The insured value of the ship was three times its fair market value before the collision. Whatever the soundness of so overinsuring a vessel, to use a figure three times the fair market value of the ship as the dividing line between a persisting duty to repair and a total loss is commercially absurd.[3] Thus the Oswego Tarmac was rendered a total loss by the collision.

We find that this in turn terminated the charter party. The charter party, though somewhat ambiguously, appears to provide for this result: "Should the vessel be lost, hire shall cease at noon on the day of her loss...." If "loss" includes constructive total loss,[4] then this terminates the charter party. Further, as a matter of business sense and of logic, we decline to find a persisting duty to repair where the cost of repair greatly exceeds the value of the ship, that is, where there is a constructive total loss, particularly since there is no express insistence in the charter on repair in such a circumstance. Because we conclude there was no duty to repair here, the

Exceptions paragraph (disregarding now the "lost" clause) is the only remaining provision on point, and it exonerates the shipowner from liability.[5]

Plaintiff has suggested that the defendant had a duty to provide substitute service. However, we find no basis for such a claim in the time charter party. There is no express provision to this effect. *Cf. Texas Co. v. Hogarth Shipping Co.*, 256 U.S. 619, 627, 41 S.Ct. 612, 613, 65 L.Ed. 1123 (1921) ("as there was no provision [in the voyage charter-party] for substituting another ship, there was no obligation on the part of the owner to furnish, nor on the part of the charterer to accept, another" (citation omitted)). Indeed, the "lost" clause just alluded to, by providing for a termination of hire, implies the absence of such a duty. More importantly, since we have determined that there was no duty to repair under these circumstances, the Exceptions paragraph of the charter party removes from the shipowner "responsibility for any loss or damage ... resulting from ... collision." In the face of this exoneration, the shipowner cannot somehow remain responsible to the extent of providing substitute service.

---

**3.** We further find support for refusing to extend the duty to repair all the way up to the insured value, in the settled doctrine that a shipowner's insurance does not extend his liability in a limitation of liability proceeding. "The proceeds of hull insurance ... do not go into the limitation fund but inure to the owner's benefit." G. Gilmore, *supra* note 1, at 752 (footnote omitted), *citing The City of Norwich*, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886).

**4.** This construction renders the clause comparable to that quoted in *McDonough Marine Service, Inc. v. M/V Royal Street*, 465 F.Supp. 928, 935 (E.D.La.), aff'd 608 F.2d 203 (5th Cir. 1979).

**5.** The charter party also contained a paragraph incorporating the terms of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. (hereinafter "COGSA"), as follows:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Although the paragraph refers to "[t]his bill of lading," it is to be read as referring to the charter party itself, under the doctrine of *United States v. Wessel, Duval & Co.*, 115 F.Supp. 678, 683 (S.D.N.Y.1953), *on trial* 123 F.Supp. 318 (1954). *See generally, Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 913 n.7 (2d Cir. 1980).

Neither party has offered argument based on this provision. However, because COGSA does include provisions concerning liability, we note that the Act would make no difference to the outcome of this case, since it provides that the shipowner "shall [not] be responsible for loss or damage arising or resulting from—... [a]ny ... cause arising without the actual fault and privity of the [owner] and without the fault or neglect of the agents or servants of the [owner]," 46 U.S.C. § 1304(2). As noted above, there is no assertion of fault on defendant's part for the collision which damaged the Oswego Tarmac. Section 1306 of COGSA also would make no difference to the outcome here as its effect, where it applies, is to leave the parties free to contract as they will.

Alternatively, were we to conclude that the terms of the contract do not furnish an answer to the question posed in this case, we nevertheless would find defendant excused under the doctrine of commercial impracticability. Whether or not as a semantic matter the vessel is labelled a total loss, the collision damage rendered further performance under the charter party commercially impracticable because rehabilitation of the vessel could be accomplished only " 'at an excessive and unreasonable cost,' " *Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 315 (D.C.Cir.1966) (citations omitted).

Plaintiff maintains that the doctrine of commercial impracticability is inapposite here, because,

> The elements of such a claim include: (a) The occurrence of an unexpected, unforeseen event; (b) Risk of the unexpected occurrence must not have been allocated by the contract or by custom; (c) The occurrence must have made performance of the contract an extreme and unreasonable hardship upon the Defendant.

Trial Memorandum of Plaintiff at 6. *See Transatlantic*, 363 F.2d at 315–16. Plaintiff argues that defendant has not proved these elements:

> the proof fails to sustain the defense: (a) The risk of collision and damage to the OSWEGO TARMAC was foreseeable and foreseen in the contract; (b) The defendant expressly assumed the risk of repairs, and in turn insured that risk up to $2,500,000 at the expense of the Plaintiff; (c) Defendant was exposed to neither loss nor hardship from performance of the repairs.

Trial Memorandum of Plaintiff at 11.

However, although the contract speaks of collision and speaks of repair, on its face there is a gap in its terms: there is no provision defining the circumstances under which the duty to repair is operative as opposed to when the ship should instead be considered lost. The document clearly indicates that, at one extreme, small defects should be repaired, and, at the other extreme, that if the ship is "lost," hire ceases; but the charter party leaves the parties' responsibilities undefined in a certain "grey zone" along the spectrum in between these two extremes. Because of the extent of damage suffered by the Oswego Tarmac and consequent cost of repair, the events in this case fall into that "grey zone," in which risk allocation is unclear. While the Exceptions paragraph provides that the shipowner is not responsible for "loss or damage ... resulting from ... collision," even this on its face does not resolve the question, since there remains the issue of whether there is a supervening duty to repair in this case, and the Exceptions paragraph begins with the disclaimer, "unless otherwise in this Charter expressly provided."

Plaintiff would have us require that the defendant prove "[t]he occurrence of an unexpected, unforeseen event." Since the charter party specified what was to occur in the event of collisions causing greater or lesser damage than was caused here, we do not consider defendant to have proven that the occurrence of a collision causing the amount of damage which eventuated here was unforeseen. However, where there is a gap in the provisions of a contract, as there is here, the question of whether the event was unforeseen is a means of determining whether the defendant assumed the risk of the event. *See Transatlantic*, 363 F.2d at 318–19 & n.11. The risk of an event which is not unforeseen, but which the contract does not cover, may most appropriately go to either party or both, depending on trade context and/or contract principles. To require the defendant to prove the event was unforeseen as a condition of an impracticability defense, would be to allocate that risk always to the defendant, that is, to construe the missing term in the contract always so as to place liability on the defendant, when in fact this may be giving the plaintiff an advantage it never bargained for or was unable to secure, and therefore one which may be out of kilter with the price and other terms of the contract. Particularly in the context of this charter party, where there are responsibilities placed upon the shipowner in the case of some collisions, but

not in the case of others, such a rule is inappropriate.

Having rejected that rule, we instead must consider the fact that defendant has not demonstrated the event was unforeseen, for what it indicates about allocation of responsibility. However, in the context of this agreement, the fact that the event was not unforeseen sheds little light on risk allocation.

Since the risk of the event was not allocated by the charter party, we next must consider whether custom in the trade allocates such a risk. The parties chose to introduce no evidence on custom in their trade in this regard. *But cf.* Berman, *Excuse for Nonperformance in the Light of Contract Practices in International Trade*, 63 Colum.L.Rev. 1411, 1423–24 (1963) (recommending comparison with other contracts in the same trade and expert testimony). However, in light of the fact that "[u]nder private charter parties, the terms and agreements of the parties may be adjusted in any manner specified by the charter," *In re International Marine Development Corp.*, 328 F.Supp. 1316, 1330 (S.D. Miss.1971) (footnote with citation omitted), we find the risk not to be allocated by custom.

Finally, we must consider whether the cost of repair was such as to make repair commercially impracticable, and whether, as plaintiff urges, defendant's insurance recovery bars an impracticability defense because of the absence of financial hardship. On the first point, we have recited above the fact that the estimated cost of repair was more than twice the value of the ship and that the ship was not a young one and was subject to reinspection and recertification requiring improvements. Moreover,

we are talking not about the greater cost of a more circuitous route, or increased freight costs, *see Transatlantic*, 363 F.2d at 319 & n.14; *American Trading and Production Corp. v. Shell International Marine Ltd.*, 453 F.2d 939, 942 (2d Cir. 1972), but rather about, in effect, rebuilding the ship. To demand this, would be to demand a kind of performance by the shipowner essentially different than that for which the charterer contracted. *See generally Transatlantic*, 363 F.2d at 319 n.15. We find the cost of repair unreasonable and impracticable.

Moreover, we reject the notion that defendant's insurance proceeds vitiate the impracticability defense because defendant suffered no financial hardship. The doctrine of commercial impracticability is an objective one. Its applicability depends upon the outlay at issue, not whether the particular defendant had the financial wherewithal to pay the commercially unreasonable expense. *See Id.* at 319, n.13; *Pauley Petroleum, Inc. v. United States*, 591 F.2d 1308, 1319–20 (Ct.Cl.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). The charter party did not specify what amount of insurance was to be carried, and certainly did not specify that the shipowner was to insure the vessel for more than its market value.[6] It was the shipowner's independent decision to enter into what was essentially a form of gambling or wagering insurance policy. The existence of excessive coverage is in this case a matter of the idiosyncratic financial circumstances of this defendant rather than a feature of the agreement between the parties[7] so as to constitute part of the objective circumstances by which commercial impracticability is to be measured. The extent of the owner's assets, other than the

---

**6.** In fact the charter party provided that "Owners shall exercise due diligence to maintain total operating costs at a minimum level consistent with the safety of the Vessel and prudent steamship management," and the paragraph makes it clear that "operating costs" includes insurance costs.

**7.** The plaintiff has asserted that although the charter party provided that it was to pay only an escalation fee on the insurance, that is, for insurance premiums over $10,000 per month, that instead, it was incorrectly billed and it

paid for the entire insurance over a certain period. *See* Trial Memorandum of Plaintiff at 16–17. We find this allegation irrelevant to the construction of the charter party and to the precise issues at hand.

We note that plaintiff presumably could have insured itself independently, or could have bargained to be included as a beneficiary of the policy which was in force here, or in general could have bargained for better terms, such as freedom from all premium payments if it was not a beneficiary of the policy.

ship, is a matter irrelevant to the issue before us and we find the extent of insurance coverage to be equally irrelevant. As we noted above, a shipowner's insurance proceeds are considered irrelevant in a limitation of liability proceeding, and that fact provides a useful analogy here as well.

As for plaintiff's demand for substitute service, while a defendant asserting an impracticability defense must in other circumstances have attempted to fulfill the contract by alternative means, here because the parties contracted with reference to a single specific ship and the subject matter of the contract was for all intents and purposes destroyed, defendant had no duty to render substitute service. *See Texas Co.*, 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123; 18 Williston on Contracts § 1948 (3d ed. 1978).

Accordingly, we find that defendant has established a defense of commercial impracticability. Under either that theory, or alternatively, an interpretation of the charter party and application of the concept of constructive total loss, we find for the defendant.

Settle order by June 8, 1981, reflecting the foregoing and the compromise agreement reached with respect to collateral issues.

SO ORDERED.