MISSOURI PUBLIC SERVICE COMPANY, Respondent,

v.

PEABODY COAL COMPANY, Appellant.

No. KCD 29611.

Missouri Court of Appeals, Western District.

Jan. 29, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 26, 1979.

Application to Transfer Denied April 10, 1979.

Thompson & Mitchell, William G. Guerri, Edwin G. Akers, Jr. and John H. Stroh, St. Louis, and Dietrich, Davis, Dicus, Rowlands & Schmitt, Edward E. Schmitt, Kansas City, for appellant.

William H. Sanders, Sr., Charles A. Schliebs, Blackwell, Sanders, Matheny, Weary & Lombardi, Judith P. Rea, Kansas City, for respondent.

Before SHANGLER, P. J., SWOFFORD, C. J., and TURNAGE, J.

SWOFFORD, Chief Judge.

This is an appeal from a decree of specific performance involving a contract between the parties wherein the appellant (Peabody) agreed to supply the respondent (Public Service) with coal for the production of electricity at the power plants of Public Service in Jackson County, Missouri over a long term. Faced with escalating costs, Peabody unsuccessfully attempted to negotiate a higher price per ton for coal furnished under the contract, and failing in such attempts, declared its intention to discontinue coal shipments. Public Service thereupon elected to consider this position of Peabody to be an anticipatory breach of the contract and thereafter instituted this action to require specific performance of the contract as it was written.

The resolution of this appeal depends upon the underlying basic facts concerning the contractual relationship of the parties. Public Service is a state-regulated public utility supplying electricity and serving the consumers in 28 Missouri counties. In anticipation of need for expanded capacity, it constructed a large coal burning power plant at Sibley, Missouri in Jackson County, and simultaneously undertook negotiations with several coal suppliers, including Peabody, for a 10-year coal supply agreement to meet the requirements of the plant. Letters of intent were signed in 1966 with Peabody and one other coal supplier. At that time, the supply of coal was described as a "buyers market" in which coal suppliers and natural gas companies competed vigorously for the business of energy producers.

Negotiations progressed between the parties to the point where Peabody made an offer to Public Service to supply its coal needs at the Sibley plant for a period of ten years at a base price of $5.40 per net ton, subject to certain price adjustments from time to time relating to costs of labor, taxes, compliance with government regulations, and increase in transportation costs, as reflected in railroad tariffs. Peabody's offer also contained an inflation escalator clause based upon the Consumer Price Index published by the United States Department of Labor. Public Service rejected this offer because of the price adjustment features, but negotiations continued and ulti-

mately resulted in the drafting by Peabody of an agreement essentially the same as the original offer in the area of price adjustments except that the inflation escalator clause was changed so that it would be based upon the Industrial Commodities Index, also published by the United States Department of Labor, but unlike the Consumer Price Index, based, in large part, upon material production costs. This final agreement was formally executed by the parties on December 22, 1967.

Performance under the agreement was profitable for Peabody during the first two years of operation thereunder. Thereafter, production costs began to outpace the price adjustment features of the contract to the extent that in 1974, Peabody requested modification of the price adjustment features. Public Service rejected all proposed modifications in this area but did offer a modification to provide for an increase of $1.00 in the original cost per net ton. This proposal was rejected by Peabody.

On September 16, 1974, a meeting was held between officials of Public Service and Peabody at the Jackson County, Missouri home office of Public Service. At this meeting Public Service again flatly rejected Peabody's proposed modifications of the contract. Peabody thereupon declared that unless these proposed modifications were met, coal shipments to Public Service would cease and the contract would be considered by Peabody to be inoperative. Contact and negotiations continued during which Public Service adamantly refused to agree to the proposed modifications and declared its intentions to hold Peabody to the terms of the original contract. Peabody, by letter dated May 6, 1975, mailed from its principal office in St. Louis, Missouri, advised Public Service that upon the expiration of 60 days all coal shipments under the contract would cease, if the contract modifications were not agreed to by Public Service.

It is undisputed that Peabody possessed adequate coal supplies and ability to perform the contract. Rather, excuse from performance is claimed upon the basis of excessive economic loss under the agreement, absent modification; that excuse from performance was lawful upon the doctrine of "commercial impracticability" under Section 400.2–615 RSMo 1969.

Peabody claimed and the evidence tended to establish that the loss was occasioned largely because the escalation clause in the contract was based upon the Industrial Commodities Index which in years prior to the execution of the contract had been an accurate measure of inflation but had ceased to be an effective measure due to the 1973 oil embargo, runaway inflation and the enactment of new and costly mine safety regulations. Public Service conceded a weakening of this significant function of the Industrial Commodities Index but introduced evidence, including admissions by Peabody, that the events bringing this about were foreseeable at the time of the execution of the contract.

Peabody introduced evidence that its losses under the contract were in excess of 3.4 million dollars at the time of the trial. Peabody's evidence showed that 60% of these claimed losses were not due to inadequacy of the price adjustment features of the contract to track inflation, but rather to reduction in price caused by lower calorific and higher waste content of the coal received than that originally contemplated under the terms of the contract. It is apparently not disputed that had the escalation clause been based upon the Consumer Price Index, Peabody's purported losses would have been substantially reduced.

That Peabody sustained loss under the contract seems clear, although the extent and cause thereof was in sharp dispute. Public Service, over objection, was permitted to show that since performance of the contract began, Peabody had experienced an approximate three-fold increase in the value of its coal reserves, presumably brought about by the same inflationary trend and other causes to which it ascribes its loss under the contract.

This cause was tried without a jury and the court entered its decree of specific performance, from which judgment Peabody appealed. Under such circumstances, the

judgment must be affirmed unless there is no substantial evidence to support it, or it is against the weight of the evidence, or erroneously declares or applies the law. Rule 73.01; *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The issues upon this appeal are essentially legal in nature, and are, in part at least, issues of first impression in Missouri. These legal issues are governed by the terms and provisions of Chapter 400, Uniform Commercial Code, RSMo 1969 (effective July 1, 1965) (U.C.C.) and in force at the time of the execution of the sales contract here involved.

At the outset, the position of Peabody as to venue in this case must be resolved. Peabody asserts that the Circuit Court of Jackson County was an improper venue for the institution of this action since it was neither present in that county nor did it breach its contract with Public Service in that county. Section 508.040 RSMo 1969. The trial court found, however, that Peabody had been guilty of an anticipatory breach of its contract with Public Service at the September 16, 1974 meeting of officials of both companies held in Jackson County, Missouri, and by reason thereof the venue was proper.

The decisional law of Missouri has long recognized the doctrine of anticipatory repudiation. *Eddington v. Cockrell*, 221 Mo. App. 52, 286 S.W. 405, 406[2] (1926); *Ewing v. Miller*, 335 S.W.2d 154, 158[6] (Mo.1955) and cases cited therein. Section 400.2–610 RSMo 1969 (U.C.C.) gives this doctrine statutory definition and provides, in part:

"Anticipatory repudiation

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

[Here the statute sets out the options available to the injured party.]

\* \* \* "

The comments accompanying this section further elaborate on this definition by stating that anticipatory repudiation "centers upon an overt communication of intention" which demonstrates "a clear determination not to continue with performance". There was ample competent evidence to support the trial court's finding that this repudiation of the contract within these definitions occurred at the meeting of September 16, 1974, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses as to what occurred at that meeting where the testimony conflicted. Rule 73.01.3(b).

Peabody's assertion that the breach of its contract. if any, occurred in St. Louis upon posting of the May 6, 1975 letter under the so-called "mail box rule" is not persuasive. Under Section 400.2–610, supra, where an anticipatory repudiation occurs, the party whose contract has thus been breached may wait a commercially reasonable time for the offending party to perform the contract or retract the repudiation thereof. It is reasonable to conclude that the letter of May 6, 1975 was nothing more than a confirmation that Peabody had no intention of performance of the contract or retraction of its earlier repudiation.

■ Further, it should be noted that U.C.C. gives the party injured by the breach a clear option to sue in specific performance, which Public Service chose to do. Section 400.2–610(b); Section 400.2–711(2)(b); Section 400.2–716. Both the form of action and the venue were proper under the facts in this case.

Nevertheless, Peabody strongly urges, as a ground for reversal of the decree, that the court erred in entering the decree because Public Service acted in bad faith in its refusal to accede to a price modification of the contract and thus Public Service breached the contract. In so doing, Peabody relies upon the U.C.C. provisions imposing the obligation of good faith upon both buyer and seller as an inherent part of all contracts for the sale of goods. Section 400.1–203 under General Provisions of U.C.C. provides:

"Obligation of good faith

Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."

■ Section 400.2–103(1)(b) under the provisions of U.C.C. relating to Sales, it is provided in part:

"Definitions and index of definitions

\*   \*   \*   \*   \*   \*

'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

\*   \*   \*"

Such good faith, honesty and adherence to commercial or business standards are also inherent in the right to maintain an equitable action for specific performance of a contract as in the case at bar. There is no evidence or present claim that Public Service acted in any particular outside the boundaries thus imposed in the original negotiations, offer and counteroffers and final execution of the sales contract here in question nor in the performance of the obligations thereunder preceding the breach by repudiation. Peabody's charge is based entirely upon the refusal of Public Service to accede to Peabody's demands for price modification, which refusal, it asserts, constituted bad faith and thus placed the onus of breach upon Public Service. Neither the law of contracts generally nor the terms of U.C.C. relied upon by Peabody lend support to this theory. The contract here involved was settled as a result of arm's length dealing with no cloud of dishonesty, lack of good faith or failure to adhere to standard business or commercial practice upon the part of either party. The fact that foreseeable economic trends or developments resulted in loss of anticipated profits or, as here claimed, actual financial loss, does not prevent Public Service from refusal of a modification of price and to take advantage of a good bargain. Such is particularly true here, for the reason that Public Service is a utility impressed with public interest and any increase in its cost in producing electricity would reflect in its rates to its public and private consumers. For this reason, its good faith, if it had agreed to a gratuitous

modification upward of its costs, might properly be called into question. Indeed, in the case of *U.S. for the Use and Benefit of Crane Co. v. Progressive Enterprises, Inc.,* 418 F.Supp. 662 (E.D.Va.1976), strongly relied upon by Peabody, the court held in similar circumstances that the purchaser "possessed the contractual right to refuse to modify and to demand performance on the original terms" (at l.c. 664). Where an enforceable, untainted contract exists, refusing modification of price and seeking specific performance of valid covenants does not constitute bad faith or breach of contract, and the trial court properly so held.

The appellant's final allegation of error is that the trial court erred in refusing to relieve or excuse it from its obligations under the contract upon the basis of "commercial impracticability" under Section 400.2–615 RSMo 1969 (U.C.C.), which section reads, in part:

"Excuse by failure of presupposed conditions

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c)[1] is not a breach of his duty under a contract for sale *if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made* or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

\*   \*   \*"

(Emphasis supplied)

■ The comments accompanying this section treat it as dealing with the doctrine of "commercial impracticability" and central to this concept is that the doctrine may

---

1. Subparagraphs (b) and (c) cover situations where a seller's capacity to perform the contract is only partially impaired and for allocation of his curtailed production among all of his customers and notice to the buyers. These provisions are not applicable here.

be applicable upon the occurrence of a supervening, unforeseen event not within the reasonable contemplation of the parties at the time the contract was made. Such occurrence must go to the heart of the contract.

Further light is shed upon the provisions of Section 400.2–615, in Comment No. 4, accompanying that section, which states:

"4. *Increased cost alone does not excuse performance* unless the rise in cost is due to some unforeseen contingency which alters *the essential nature of the performance.* Neither is a rise or a collapse in the market in itself a justification, *for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover.* But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section." (Emphasis added)

In the case of *Transatlantic Financing Corp. v. United States,* 124 U.S.App. D.C. 183, 186, 363 F.2d 312, 315[3] (1966) the court articulates the ingredients necessary to establish the claim of "commercial impracticability" as (1) the occurrence of a contingency; (2) the nonoccurrence of which was a *basic assumption* upon which the contract was made; and (3) by which occurrence further performance has become commercially impracticable. The fact that the statute is drawn in such general terms is to provide flexibility in its application and full scope for the application of equitable principles and considerations with which the doctrine of commercial impracticability is imbued, as recognized in the *Transatlantic Financing Corp.* decision, *supra.* When so viewed and applied, a wide variety of *commercial situations often unique to the* particular case under consideration are subject to scrutiny. This is particularly true in a case such as the one at bar, where the claim of commercial impracticability is based primarily upon the fact that the performance of the contract results in great financial loss to Peabody due to increase in cost of production (due to the causes enumerated) which were not foreseeable at the time the contract was made. In this connection, Peabody argues that in the resolution of this issue, only the contract in litigation should be considered by the court and that the factors of Peabody's financial condition, experience in the production of coal, resources, availability of the raw material (coal reserves) and other factors should be disregarded. This argument is without merit and Peabody cites no authority in support thereof. Those factors have a direct bearing and evidentiary value in determining the question of foreseeability of the occurrence triggering the loss. See e. g. *Eastern Airlines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429 (S.D.Fla.1975). A commercial, governmental or business trend affecting a contract's value which would be foreseeable to a party with wide experience and knowledge in the field and, perhaps, not to a party with less; a loss to a party with vast resources and ample supply of raw materials to perform a bad bargain would be less harmful than to a party without them; and, the application of the doctrine and the equitable principles inherent therein might call for relief in one instance and not another based upon these factors, and others, outside the strict confines of the contract itself.

Further, the trial court is put upon inquiry and finding (under the statute) that the nonoccurrence of the event was a "basic assumption on which the contract was made" and that the occurrence of such event "alters the essential nature of the performance thereunder." See: *Eastern Airlines v. Gulf Oil Corp., supra; United States v. Wegematic Corp.,* 360 F.2d 674 (2d Cir. 1966); *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7th Cir. 1974); 6 Corbin on Contracts, Section 1333 (Rev.Ed.1962); 6 Williston on Contracts, Section 1952 (Rev.Ed.1938).

A recent case which is strikingly similar to the case at bar is *Iowa Electric Light & Power Co. v. Atlas Corporation*, 23 U.C.C. Rep.Service (U.S., N.D.Iowa 5/4/78). In that case, the Iowa Electric entered into a contract in 1973 whereby it was to purchase approximately 700,000 pounds of uranium concentrate from Atlas, at a beginning price per pound of $7.10, over an extended period for use in the production of electric energy. The contract contained an escalation clause providing for an automatic inflationary price per pound increase of $0.12329 cents per day or 3¾% per month on July 15th of each year so that the contract price by 1978 would be approximately $8.45 per pound. Because of late deliveries, Iowa Electric by way of a proceeding in injunction, in the nature of specific performance, sought to insure deliveries under the terms and at the price established in the contract, and Atlas counterclaimed seeking to reform the contract by judicial decree so as to provide a higher price per pound for the product upon the basis of commercial impracticability. The case was tried upon the counterclaim by stipulation of the parties and the court denied Atlas the relief sought and dismissed its counterclaim.

The basis upon which Atlas sought relief was that unforeseen factors had so drastically increased its costs and resulted in burdensome losses amounting to approximately $1,800,000.00 in 1976 and projected to losses of approximately $4,000,000.00 in fiscal years 1977–1979. Atlas attributed the increase in its costs to the Arab oil embargo and OPEC cartel, unexpected federal environmental and occupational safety regulations, inflation in wages and costs of chemicals and equipment, and certain uranium market conditions. Atlas produced evidence that its costs had increased to $17.40 per pound and that the open market price per pound in 1977 was $43.00 per pound. The court held, among other things:

(1) That the term " 'impracticable' as used in U.C.C. § 2–615 does not mean impossible and each situation should be viewed in the context of reasonable commercial relationships"; that "Atlas must show that the increase is more than onerous or expensive and that it had no part in stimulating that increase"; and that the "burden of proving each element of impracticability is on the party claiming excuse".

(2) That, although some of the factors which resulted in the increased cost of production may have been unforeseen and the total impact was not contemplated by the parties during contract negotiations, prior to contract there was good reason to anticipate rising costs and drastically increased expense arising from inflation and governmental environmental and safety regulations.

(3) It was not clear that Atlas was not in a position to protect itself contractually from some of the risks; that some of the increased costs resulted from internal corporate decisions; and, that increased costs were partially due to rise in the market price of uranium, the fact that Atlas' reserve in Alkaline ores used in processing uranium were rapidly becoming exhausted, facts known to Atlas at the time the contract was negotiated.

The court in *Iowa Electric* refused to reform the contract principally upon the basis of the failure of Atlas to sustain its burden of proof to establish "commercial impracticability", but the facts there are so similar the case stands for an acceptable precedent in the case at bar.

It should again be emphasized that in the negotiations leading to the contract now before this Court an escalator clause was agreed upon to cover the contingencies of increase in Peabody's costs due to wages reflected by labor contracts; payments for unemployment, social security taxes and Workmen's Compensation insurance premiums; costs of compliance with federal, state and local laws, regulations or orders; railroad tariffs; and, increase in the costs of material and supplies, explosives, electric power and administrative and supervisory expense based upon the Industrial Commod-

ities Index of the Department of Labor. There is no evidence nor, indeed, serious claim, that Public Service did not abide by the letter of these provisions, and in addition, prior to suit, agreed to a further price increase of $1.00 per net ton, which Peabody rejected.

The facts as shown by the record lead to the conclusion that at least some of the loss resulted from the fact that for some unexplained reason the Industrial Commodities Index lagged behind the Consumer Price Index, the measuring factor first proposed by Peabody, in reflecting inflationary cost increases. That such indexes were based upon different commercial and economic factors was presumably known by both parties since each was skilled and experienced in those areas and the divergence between the indexes could not be said to be unforeseeable. Be that as it may, Peabody agreed to the use of the Industrial Commodities Index factor.

The other claim made by Peabody alleged to bring it within the doctrine of "commercial impracticability", is the Arab oil embargo. Such a possibility was common knowledge and had been thoroughly discussed and recognized for many years by our government, media ·economists and business, and the fact that the embargo was imposed during the term of the contract here involved was foreseeable. Peabody failed to demonstrate that this embargo affected its ability to secure oil or petroleum products necessary to its mining production albeit at inflated cost. In fact, as previously stated, this embargo can reasonably be said to have, at least indirectly, contributed to the marked appreciation to the value of Peabody's coal reserves by forcing the market value of that alternative source of energy upward in this country.

It is apparent that Peabody did make a bad bargain and an unprofitable one under its contract with Public Service resulting in a loss, the cause and size of which is disputed. But this fact alone does not deal with either the "basic assumption" on which the contract was negotiated or alter the "essential nature of the perform-ance" thereunder so as to constitute "commercial impracticability". The court below properly decreed specific performance.

The judgment is affirmed.

All concur.