LOUISIANA POWER & LIGHT COMPANY

v.

ALLEGHENY LUDLUM INDUSTRIES, INC. and Allegheny Ludlum Steel Corporation.

Civ. A. No. 79–3308.

United States District Court, E. D. Louisiana.

July 17, 1981.

W. Malcolm Stevenson, Monroe & Lemann, New Orleans, La., for plaintiff.

David Stone, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Gregory A. Pearson, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants.

## MEMORANDUM AND ORDER

JACK M. GORDON, District Judge.

This breach of contract case is before the Court on plaintiff's motion for summary judgment. The material facts which are not in dispute are as follows:

Plaintiff, Louisiana Power & Light Company (hereinafter referred to as "LP&L"), entered into a contract with defendants, Allegheny Ludlum Industries, Inc. and Allegheny Ludlum Steel Corporation (hereinafter referred to collectively as "Allegheny,") in which Allegheny agreed to supply condenser tubing to LP&L for use at LP&L's Waterford 3 nuclear power plant. The contract was awarded to Allegheny Ludlum Steel Corporation, then a division of Allegheny Ludlum Industries, Inc., after the solicitation of bids by LP&L's agent, Ebasco Services, Incorporated. The contract, dated February 8, 1974, was accepted by Allegheny in mid-March of 1974.

Pursuant to the terms of the contract Allegheny undertook to furnish, fabricate and deliver to LP&L stainless steel condenser tubing in accordance with the specifications of LP&L's agent, Ebasco. Equal shipments of the tubing were to be made on June 1, 1976; June 15, 1976, and July 1, 1976, for a total price of $1,127,387.82. The contract also provided that if LP&L delayed shipment beyond August 31, 1976, but not later than January 31, 1977, the contract price would be increased by three percent (3%). A further adjustment at the rate of ten percent (10%) would take place if LP&L delayed shipment beyond January 31, 1977, but not later than January 31, 1978. No other escalation clauses were included in the contract.

On May 19, 1975, Allegheny sent a letter to LP&L seeking "additional compensation" for performance under the contract. Allegheny informed LP&L that subsequent to the formulation of the contract its "costs [had] risen at such a high rate that escalators built into our contracts have in no way adequately compensated for them. For example, since March of 1974 the price of electrolytic nickel has increased 24%, low carbon ferrochrome 185% and labor 21%."[1] Allegheny sought the opportunity to meet with representatives of LP&L in order to discuss Allegheny's price increases and possible solutions to Allegheny's problem. Allegheny suggested a renegotiation of the contract price, but LP&L chose not to meet with Allegheny to discuss the matter.

In October of 1975, LP&L, through Ebasco, advised Allegheny that it considered Allegheny's price increases to be business risks which must be absorbed by Allegheny. On November 4, 1975, Allegheny informed LP&L, by letter from C. R. Hastings, General Manager of Allegheny's Wallingford Tubular Products Division, that a "[c]urrent review of this matter suggests that Allegheny Ludlum might be well advised not to perform under the contract." On November 19, 1975, Ebasco wrote to Allegheny's Wallingford Tubular Products Division, and demanded written assurances within thirty days, pursuant to Section 2–609 of the New

1. Exhibit 2, Plaintiff's Memorandum in Support of Motion for Summary Judgment.

**1322**

York Commercial Code,[2] that Allegheny would fully and properly perform under the contract.

As of January 19, 1976, LP&L had not received any such written assurance of performance from Allegheny and on January 30, 1976, LP&L notified Allegheny by letter that it considered the contract repudiated by Allegheny. Thereafter, on February 17, 1976, C. R. Hastings at Allegheny wrote to LP&L informing it that Allegheny was willing to "make delivery under the subject purchase order at $1.80 per lb. . . . [Allegheny's] full cost of producing the material . . ."

LP&L rejected Allegheny's offer to supply the tubing at Allegheny's cost and through its agent, Ebasco, LP&L solicited bids from other vendors for supply of the requisite condenser tubing. LP&L steadfastly rejected the offer of Allegheny to supply the tubing at Allegheny's cost, a price higher than that specified in the LP&L/Allegheny contract. On June 16, 1976, LP&L, through Ebasco, entered into a contract with Trent Tube Division of Crucible, Inc. for the purchase of condenser tubing at a price of $1,729,278.

Allegheny intended that the condenser tubing which was the subject of its contract with LP&L would be supplied by its Wallingford Tubular Products Division at Wallingford, Connecticut. C. R. Hastings, General Manager of the Wallingford Tubular Division, stated in his deposition that performance under the terms of the LP&L/Allegheny contract would have caused Allegheny to sustain a projected loss of $428,500 on the contract. Hastings indicated that such a loss would have reduced the planned profit for 1976 at the Wallingford plant from $1,018,000 to $589,500.

Plaintiff seeks by way of its lawsuit to recover from Allegheny the costs of its "cover," the monetary difference between the LP&L/Allegheny contract and the LP&L/Trent Tube contract, plus the expenses which it incurred in the re-solicitation of bids for the tubing. Allegheny has defended this action on four principal bases:

commercial impracticability, mutual mistake, unconscionability and alleged bad faith conduct by LP&L. Plaintiff's claim and Allegheny's defenses will be considered in accord with the appropriate standards for summary judgment motions.

LP&L claims that Allegheny breached its contract to supply condenser tubing to LP&L. The first evidence which LP&L received that indicated that Allegheny would not perform under the contract as written was Allegheny's letter of May 19, 1975 to LP&L in which Allegheny sought "additional compensation" for supplying the condenser tubing. In response to that submission, LP&L sent a letter to Allegheny, invoking the provisions of Section 2–609 of the New York Uniform Commercial Code and requesting assurance from Allegheny that it would perform under the contract.

The pertinent provisions of Section 2–609 of the U.C.C., invoked by LP&L, provide:

§ 2–609 Right to Adequate Assurance of Performance

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance . . . .

*    *    *    *    *    *

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

The letter which LP&L received from Allegheny requesting "additional compensation" provided LP&L with a reasonable basis for insecurity as to Allegheny's performance under the contract. LP&L's letter of November 19, 1975, to Allegheny constituted an adequate demand on Allegheny for an assurance of performance. When LP&L failed to receive such an assurance by Janu-

---

**2.** The contact between LP&L and Allegheny stated that the contract was to be governed by the laws of the State of New York, hence the

invocation of § 2–609 of the New York Commercial Code.

ary 19, 1976, it was justified in characterizing the contract as repudiated. LP&L notified Allegheny of that fact on January 30, 1976. Subsequently, Allegheny indicated to plaintiff that it would perform under the contract for added compensation. Such a belated and qualified offer of performance cannot, however, be viewed as an assurance of performance under § 2–609 of the U.C.C. Allegheny's failure to supply an assurance of performance within the allotted time period operated as a repudiation of the contract.

The U.C.C. provides that:

"When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... (b) resort to any remedy for breach (Section 2–703 or Section 2–711), ..." Uniform Commercial Code § 2–610.

One available remedy in the event of a breach is for the buyer to obtain a "cover" by purchasing goods in substitution for the goods due from the seller. A buyer and non-breaching party may then seek to recover from the seller and breaching party the price of such substituted goods plus incidental and consequential damages. See U.C.C. § 2–711 and § 2–712. It is just such a claim that plaintiff is making in the instant case. Based on the undisputed facts in this case, plaintiff is entitled to recover on that claim, unless Allegheny prevails on one of its defenses.

COMMERCIAL IMPRACTICABILITY.

The first of Allegheny's defenses to be considered is that of commercial impracticability. The Uniform Commercial Code provides that performance under a contract may be excused if performance under the contract is commercially impracticable. Section 2–615 of the U.C.C., upon which Allegheny relies in its defense of commercial impracticability, states in pertinent part:

§ 2–615. Excuse by Failure of Presupposed Conditions.

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is, not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made ....

In reliance upon that rule of law Allegheny argues that its performance under the contract with LP&L was rendered commercially impracticable because of a "severe shortage of critical raw materials and an increase in the cost of labor, an unexpected contingency which caused a dramatic increase in the price of those raw materials and the condenser tubing. The non-occurrence of such was a basic assumption on which the contract was founded and altered the essential nature of performance."[3]

There are three conditions which must be met pursuant to Section 2–615 before performance under a contract can be excused because of commercial impracticability. "(1) a contingency must occur, (2) performance must thereby be made 'impracticable' and (3) the non-occurrence of the contingency must have been a basic assumption on which the contract was made." *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293 (7th Cir. 1974).

The rule has also been stated as "excus[ing] delay or nondelivery when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was entered into." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 988 (5th Cir. 1976). The rationale behind the doctrine of commercial impracticability is that when an event oc-

3. Defendants' Answer, paragraph 13.

curs which renders performance so "vitally different" from that which is anticipated, the contract cannot be reasonably considered to govern and performance under that contract is excused. *Eastern Air Lines, Inc., supra,* at 991.

■ The burden of proof on a claim of commercial impracticability rests with the party making the claim, in this case the defendants. Allegheny must meet its burden as to each of the requisite three elements in order to be successful in this defense. See *Eastern Air Lines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429, 438 (S.D.Fla. 1975), citing *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.,* 480 F.2d 1112, 1117 (9th Cir. 1973).

■ The undisputed facts in this case show that Allegheny has not and cannot meet its burden of proof as to this defense because it is unable to show that performance under the contract was commercially impracticable. Allegheny contacted LP&L in May of 1975 and informed LP&L that between March of 1974 and May of 1975, its costs for electrolytic nickel had risen by 24%, for low carbon ferrochrome had risen by 185%, and that its labor costs had risen by 21%. C. R. Hastings, General Manager of Allegheny's Wallingford Tubular Division stated in his deposition that had Allegheny performed under the contract as written, it would have sustained a loss of $428,500 on the contract and that the planned profitability of the Wallingford plant would have been reduced to an overall profit of $589,500 for the year of performance.

There are no facts which indicate that Allegheny's costs increased by more than the amount indicated to LP&L in the Allegheny letter of May 19, 1975. Moreover, there are no facts which indicate that Allegheny would have sustained a greater loss than that attested to by C. R. Hastings had it performed under the contract. There are also no facts which indicate that Allegheny would have been unprofitable during 1976

in either its overall corporate structure or in its Wallingford Tubular Division had it performed under the contract as written. Hastings testified in his deposition that a profit was anticipated for the Wallingford plant even had Allegheny been required to perform under the contract's terms. The material facts in this regard are clear, simple and undisputed. When viewed in the context of a claim of commercial impracticability, as that term has been interpreted in the case law, it must be said that performance under the contract was not commercially impracticable.

The mere fact that performance under the contract would have deprived Allegheny of its anticipated profit and resulted in a loss on the contract is not sufficient to show commercial impracticability. Rather, " . . . [t]he party seeking to excuse his performance must not only show that he can perform only at a loss but also that the loss will be especially severe and unreasonable." *Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588, 600 (3d Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), *petition for cert. dismissed,* 435 U.S. 911, 98 S.Ct. 1462, 55 L.Ed.2d 502 (1978).

Allegheny's loss by performance would not have been especially severe and unreasonable in this case. On the contrary, by Allegheny's own estimate its costs of performance under the contract increased only 38% over the original contract price of $1,127,387.82. While no seller desires to be called upon to perform under a contract when performance will result in a financial loss, such are the realities of commercial life. Whereas the law quite properly provides relief for situations in which performance can only be had at an excessive and unreasonable cost, *see Transatlantic Financing Corp. v. U. S.,* 363 F.2d 312 (D.C. Cir. 1966), Allegheny's cost of performance did not increase to the extent necessary to excuse its performance under the doctrine of commercial impracticability.[4]

---

4. When consideration is given to Allegheny's anticipated profitability in 1976, it becomes more apparent that this was not a situation

wherein performance under the contract would have been especially severe and unreasonable.

*Eastern Air Lines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429, 438 (S.D.Fla.1975) is instructive:

The modern U.C.C. § 2–615 doctrine of commercial impracticability has its roots in the common law doctrine of frustration or impossibility and finds its most recognized illustrations in the so-called "Suez Cases", arising out of the various closings of the Suez Canal and the consequent increases in shipping costs around the Cape of Good Hope. Those cases offered little encouragement to those who would wield the sword of commercial impracticability. As a leading British case arising out of the 1957 Suez closure declared, the unforeseen cost increase that would excuse performance "must be more than merely onerous or expensive. It must be positively unjust to hold the parties bound." *Ocean Tramp Tankers v. V/O Sovfracht (The Eugenia),* 2 Q.B. 226, 239 (1964). To the same effect are *Tsakiroglou and Co. Ltd. v. Noblee Thore G.m. b.H.,* 2 Q.B. 348 (1960), aff'd, A.C. 93 (1962), and *Caparanoyoti & Co., Ltd. v. E. T. Green, Ltd.,* 1 Q.B. 131, 148 (1959). These British precedents were followed by the District of Columbia Circuit, which gave specific consideration to U.C.C. 2–615, Comment 4, in *Transatlantic Financing Corp. v. United States,* 124 U.S.App. D.C. 183, 363 F.2d 312, 319 (1966).

In *Transatlantic Financing Corp., supra,* Judge J. Skelly Wright considered a claim of commercial impracticability and impossibility in connection with a suit seeking additional compensation for transport of a cargo of wheat around the Cape of Good Hope. The plaintiff was forced to abandon its customary route through the Suez Canal when Egypt obstructed the canal and closed it to traffic. Plaintiff argued that it was subjected to additional expense of $43,-972.00 above the contract price of $305,-842.92 because of the longer journey necessitated by the closing of the canal. The Court stated:

" . . . While it may be an overstatement to say that increased cost and difficulty

of performance never constitute impracticability, to justify relief there must be more of a variation between expected cost and the cost of performing by an available alternative than is present in this case, where the promisor can legitimately be presumed to have accepted some degree of abnormal risk, and where impracticability is urged on the basis of added expense alone." 363 F.2d at 319.

The Court affirmed the dismissal of the plaintiff's action because performance under the contract had not been rendered legally impossible.

In a similar case resulting from the closure of the Suez Canal, it was held that extra expense of 31.6% of the contract price, incurred in bringing the vessel around the Cape of Good Hope, was not sufficient to constitute commercial impracticability. *American Trading and Production Corp. v. Shell International Marine, Ltd.,* 453 F.2d 939 (2d Cir. 1972). In discussing the degree of increase in costs that would constitute impossibility or commercial impracticability, it was stated that:

Mere increase in cost alone is not a sufficient excuse for non-performance (Restatement of Contracts § 467 (1932)). It must be an "extreme and unreasonable" expense (Restatement of Contracts § 454 (1932)). While in the Transatlantic case supra, the increased cost amounted to an increase of about 14% over the contract price, the court did cite with approval the two leading English cases *Ocean Tramp Tankers Corp. v. V/O Sovfracht (The Eugenia),* [1964] 2 Q.B. 226, 233 (C.A.1963) (which expressly overruled *Societe Franco Tunisienee D'Armement v. Sidemar S. P. A. (The Messalia),* [1961] 2 Q.B. 278 (1960), where the court had found frustration because the Cape route was highly circuitous and involved an increase in cost of approximately 50%), and *Tsakiroglou & Co. Lt. v. Noblee Thorl G.m.b.H.,* [1960] 2 Q.B. 318, 348, aff'd, [1962] A.C., 93 (1961) where the House of Lords found no frustration though the

freight costs were exactly doubled due to the Canal closure. 453 F.2d at 942.[5]

In *Iowa Electric Light and Power Company v. Atlas Corporation*, 467 F.Supp. 129 (N.D.Iowa,1978) the court held that an increase in seller's costs by 52.2%, resulting in the seller's loss of approximately $2,673,-125.00, failed to constitute commercial impracticability thereby precluding judicial adjustment or discharge of the contract for supply of uranium concentrate. In making such a determination, the court noted that cost increases of 50–58 percent had generally not been considered of sufficient magnitude to excuse performance under a contractual agreement.

As the jurisprudence indicates, Allegheny's performance under the contract was not commercially impracticable. Even if Allegheny were to show that its increased costs constituted a contingency, the non-occurrence of which was a basic assumption on which the contract was made, it still could not show that performance had been rendered commercially impracticable as a result. Allegheny bears the burden of proof as to each of the requisite three elements on its claim of commercial impracticability. Being unable to prove all three elements, its defense must fall.

▮ Allegheny has suggested that claims of commercial impracticability are inherently insusceptible of resolution by summary judgment. That position is incorrect. While great care should be exercised in granting summary judgment motions in cases of this sort, the mere invocation of the term "commercial impracticability" is not a talisman behind which a defaulting seller may hide and be guaranteed a trial in the absence of a dispute as to the material facts in the matter. Were that the case, every seller or buyer caught in a burdensome position under a contract would find it hard to resist the natural temptation to compel renegotiation of unprofitable contracts by threatening to invoke a claim of commercial impracticability, knowing that it would be assured of a trial on the merits and knowing that even if it lost at trial, it would be required to do no more than fulfill its obligation under the contract. Such a rule of law would constitute a misuse of the protections afforded by the doctrine of commercial impracticability, particularly in cases of this sort where the facts are clear and undisputed and in which the seller in breach has been unable to cite a case wherein a claim of commercial impracticability has been upheld under similar factual circumstances.[6]

The clear undisputed facts require resolution of the commercial impracticability defense in plaintiff's favor. Allegheny is unable to meet its burden of proof.

MUTUAL MISTAKE.

By way of defense, Allegheny also argues that it was excused from performance under the contract because the parties were mutually mistaken as to material facts at the time of entry into the contract. Specifically, Allegheny contends that both it and LP&L implicitly assumed certain facts in their contract; that the purchase price and the escalation clause set forth in the contract would allow Allegheny to make a profit on the contract, even if shipment

---

**5.** The Court noted that the English doctrine of frustration and the American doctrine of "impossibility" are considered to be substantially similar.

The doctrine of commercial impracticability is distinguishable from the doctrine of "impossibility" because of the "commercial character of the criterion [for commercial impracticability]" U.C.C. § 2–615, comment 3. Nevertheless, cases which deal with the concept of "impossibility" on commercial bases have bearing in consideration of claims of commercial impracticability under the U.C.C.

**6.** In *Aluminum Company of America v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980), a claim of commercial impracticability was upheld. The facts surrounding the claim of commercial impracticability in *Alcoa* are, however, distinguishable from those in the instant case. Plaintiff stood to lose $60,000,000.00 in *Alcoa* if its performance under the contract was compelled while the defendant stood to gain a concomitant "windfall profit." There are no comparable facts in the instant case. Allegheny stood to lose $428,500 on a $1,127,387.82 contract. It cannot be said that LP&L would be the beneficiary of a "windfall profit" like that in *Alcoa*.

were delayed. Allegheny contends that the parties were mutually mistaken in that assumption and in the assumption that increases in the price of raw materials and labor would remain constant as they had in the years prior to contracting.

"Mutual mistake" was defined in *Leasco Corp. v. Taussig*, 473 F.2d 777 (2d Cir. 1972).

"The legal concept of 'mistake' is similar to the legal concept of 'misrepresentation' in that, under each, a party to a contract may be relieved from his obligations if he was unaware of certain material facts. 'Mistake', however, is only such error as is made without representation or deception; by the other parties to the transaction. 13 Williston on Contracts § 1540 (3d Ed. 1970). Where the mistake is unilateral, the contract is not voidable. But where both parties assume a certain state of facts to exist, and contract on the faith of that assumption, they can be relieved from their obligations if the assumption is erroneous. See *Baumann v. Florance*, 267 App.Div. 113, 114, 44 N.Y.S.2d 706, 707 (3d Dept. 1943)." 473 F.2d at 781.

In *Wright and Pierce v. Town of Wilmington, Massachusetts*, 290 F.2d 30, 33 (1st Cir. 1961) the court stated that a mutual mistake of fact is of sufficient importance to void a contract "when the mistake relates to a fact which is of the very essence of the contract, the material element in the minds of both parties, and material in the sense that it is one of the things contracted about."

The mistake must, however, relate to the facts as they existed at the time of contracting. As the Restatement (Second) of Contracts § 293, noted in Comment a: "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here," cited with approval in *Shear v. National Rifle Association of America*, 606 F.2d 1251 (D.C.Cir. 1979).

Allegheny cites the case of *Aluminum Company of America v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980) as authority for the proposition that mutual mistake relieves it from performance under its contract with LP&L. The *Aluminum Company of America ("Alcoa")* case is, however, distinguishable from the matter before this Court.

At issue in *Alcoa* was a "toll conversion service contract" under which Essex supplied Alcoa with alumina which Alcoa converted by a smelting process into molten aluminum. Essex then obtained the molten aluminum from Alcoa for further processing. By its terms the contract ran for sixteen years with an optional five year extension period. The price provisions under the contract included a detailed escalation formula developed with the assistance of economist Alan Greenspan. The formula provided for an escalation of the per pound contract price in accordance with changes in the Wholesale Price Index-Industrial Commodities (WPI–IC) and in accordance with an index based on the average hourly labor rates paid to plant employees. The Wholesale Price Index was chosen for use in the escalation clause because it had closely corresponded with Alcoa's non-labor costs in the years before entry into the contract. The intent of the escalation clause was to enable Alcoa to achieve a stable net income of approximately 4¢ per pound on the aluminum converted.

Problems arose under the Alcoa contract with the onset of the energy crisis. That crisis resulted in dramatic increases in the cost of alumina conversion. The Wholesale Price Index employed in the contract's escalation clause failed to rise commensurately with the increase in energy costs and as a result Alcoa stood to lose $60 million during the term of the contract. In light of such extreme circumstances, the court accepted Alcoa's arguments of mutual mistake and commercial impracticability and granted relief to Alcoa. The court concluded that the parties were mistaken in their estimate of the suitability of the WPI–IC as an objective index of Alcoa's non-labor production costs and allowed reformation of the contract on that basis.

*Alcoa* is distinguishable from the instant case because of the detailed nature of its escalation clause and the reasons for its use. There is no comparable escalation clause in the contract at issue herein. The only escalation provisions in the LP&L/Allegheny contract relate to price increases of 3% and 10% if LP&L delayed delivery under the contract beyond August 31, 1976 and January 31, 1977, respectively. The provisions would operate to protect Allegheny only in the event that LP&L postponed Allegheny's performance beyond the dates specified in the contract for such performance. There are no provisions, as there were in *Alcoa*, which would serve to escalate the price and protect Allegheny in the event that there were price increases prior to the scheduled time of performance. In that regard, the escalation clause in *Alcoa* and in the instant case are markedly different. While the mistake in *Alcoa* might be viewed as a mistake at the time of contracting as to the suitability of the Wholesale Price Index as an escalator, the alleged mistake in the instant case is no more than a mistake as to a future economic event, that Allegheny would make a profit on the contract. There is nothing in this case which would show that there was a mutual mistake as to a material element at the time of contracting. At most, Allegheny made an erroneous prediction of future economic events; that it would make a profit under the contract.[7]

Moreover, under general rules of contract interpretation, the inclusion of an escalator clause to protect Allegheny in the event LP&L delayed delivery and the absence of an escalation clause to protect Allegheny from price increases prior to the date of delivery, evidences an intent to exclude protection from pre-delivery date prices increases. Allegheny accepted the risk of pre-delivery date price increases and

cannot now be heard to complain because it failed to fully protect itself by including an escalation clause for price increases in its contract with LP&L.

The instant case is more nearly like the case of *Leasco v. Taussig, supra,* than it is like *Alcoa, supra.* In *Leasco* the court held that the failure of a business to realize a profit as anticipated did not entitle the business' would-be buyer to escape his contractual obligation to purchase the business. The mistake in *Leasco* was a mistake in the prediction of future profit, not a mistake as to a material fact at the time of entry into the contract. Similarly, the mistake claimed in the instant case was also a mistake in the prediction of future events. The doctrine of "mutual mistake" does not protect Allegheny under the facts of this case.

## UNCONSCIONABILITY

Section 4 of the Supplementary Terms and Conditions of the LP&L/Allegheny contract provides that:

"4. Provision for Cancellation

At any time after the acceptance of this Order the Purchaser shall have the absolute right to cancel the entire Order upon the payment to the Seller for all disbursements and expenses which the Seller has incurred or become obligated for prior to date of notice of cancellation, less the reasonable resale value of equipment which shall have been obtained or ordered to become an integral part of the Equipment plus a sum as profit bearing the same ratio to the profit that the Seller would have received upon completing the Work as that portion of Work done bears to the entire amount of Work to be done by the Seller under this Order."

Allegheny argues that the aforementioned cancellation provision is unconscionable, that it taints the contract in its entirety and

---

7. The Court cannot help but note that a profit-making objective is at the center of the vast majority of commercial contracts. Were courts to conclude that the mere failure of a party to achieve an anticipated profit might constitute a mistake of fact such as would allow alteration or rescission of a contract, then such a claim could be made in virtually every case in which a party failed to realize an expected profit. The doctrine of mutual mistake was not created to insulate individuals and corporations engaged in business from the realities and risks of commercial life.

that as a result the contract is unenforceable. Accordingly, Allegheny urges that LP&L be barred from any recovery for damages.

The unconscionability which Allegheny suggests is rooted in the alleged one-sidedness of the provision which provides a right of cancellation to LP&L with no concomitant right given to Allegheny. The defendants submit that until production commenced, LP&L could cancel its order with impunity and would only be required to pay a penalty for cancellation "if Allegheny would be making a profit on the order, which LP&L now knew it would not ..."[8]

Section 2–302 of the U.C.C., which is the basis for Allegheny's claim of unconscionability states:

"§ 2–302 Unconscionable Contract or Clause

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

\* \* \* \* \* \*

"(3) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

■ Comment 1 to U.C.C. § 2–302 sets forth the standards to be used in making a determination on an unconscionability claim. "The basic test is whether in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are as one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power."

■ Allegheny's allegation of unconscionability presents a question of law to be decided by the Court. It is not a jury issue. U.C.C. § 2–302. *W. L. May Co., Inc. v. Philco-Ford Corp.*, 273 Or. 701, 543 P.2d 283 (1975). However, plaintiff's claim that the cancellation clause and the contract were unconscionable entitles the parties to "a reasonable opportunity to present evidence as to ... commercial setting, purpose and effect to aid the court in making ... [its] determination." U.C.C. § 2–302(2). The unconscionability claim is not susceptible of resolution by summary judgment. The Court's determination of the issue cannot be made without a hearing. *Zicari v. Joseph Harris Co.*, 33 A.D.2d 17, 304 N.Y.S.2d 918 (N.Y.1969). Accordingly, plaintiff's motion for summary judgment must be denied in this regard.

BAD FAITH

Allegheny also asserts that bad faith conduct by LP&L serves as a defense to LP&L's claim for breach of contract. The basis of Allegheny's allegation of bad faith is that LP&L refused to meet with it in a timely fashion to discuss renegotiation of the contract. Allegheny argues that its bad faith allegation must be resolved at trial by the finder of fact.

■ The Uniform Commercial Code imposes an obligation of good faith on the performance or enforcement of contracts under the Code. U.C.C. § 1–203. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." U.C.C. § 2–103(1)(b).

Allegheny's defense of bad faith based on LP&L's failure to engage in timely renegotiation of the contract is without merit. There is no obligation imposed under law which would have required LP&L to engage in renegotiation or even discuss renegotiation of its contract with Allegheny.

---

**8.** Defendants' Memorandum in Opposition to Motion for Summary Judgment, p. 29.

*See Missouri Public Service Company v. Peabody Coal Company,* 583 S.W.2d 721, 725 (Mo.App.1979), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88. Allegheny has not attempted to show any requirement for renegotiation. Allegheny's claim that LP&L was in bad faith for failure to do what it had no obligation to do cannot withstand scrutiny. It cannot survive the test of plaintiff's summary judgment motion.

Insofar, however, as Allegheny makes a claim of bad faith conduct in connection with LP&L's purchase of goods in substitution for those due from Allegheny, the "cover" under U.C.C. § 2–712(1), that defense relates to the damages portion of LP&L's lawsuit. The issue awaits resolution with LP&L's claim for damages.

In that regard, this Court cannot now say that there are no genuine issues of material fact surrounding LP&L's claim for damages. The facts surrounding the obtaining of a "cover," timeliness, mitigation of damages, good faith and costs cannot be decided at this time. Unlike the liability portion of plaintiff's claim and consideration of certain of Allegheny's defenses, the issue of LP&L's damages awaits resolution at trial.

### CONCLUSION

Based on the foregoing authorities and analysis, the Court hereby GRANTS the motion of Louisiana Power & Light Co. for summary judgment on the issue of liability and Allegheny's defenses of commercial impracticability, mistakes of fact and bad faith. The motion for summary judgment must be DENIED insofar as Allegheny's defense of unconscionability and the issue of LP&L's damages are concerned.